## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF PENNSYLVANIA

TUAN SAMAHON                               )
                                           )
c/o Villanova University School of Law     )
299 North Spring Mill Road                 )
Villanova, PA 19085-1516                   )
                                           )
     Plaintiff,   )
                                           )
v.                                         )          Civil Action
                                           )
UNITED STATES DEPARTMENT OF JUSTICE        )
                                           )
950 Pennsylvania Avenue, NW                )
Washington, DC 20530-0001                  )
                                           )
     Defendant    )
                                           )
_____        )

## COMPLAINT

Plaintiff Professor Tuan Samahon commences this civil action under the Freedom of

Information Act (FOIA), 5 U.S.C. § 552, and the Administrative Procedure Act (APA), 5 U.S.C.

§ 701-06. He asks this Court to compel the U.S. Department of Justice (DOJ) to disclose an

Office of Legal Counsel (OLC) agency record, the 2004 Goldsmith Memorandum, which DOJ

has improperly withheld. On the one hand, DOJ has improperly withheld most of the Goldsmith

Memorandum with very heavy redaction; on the other hand, DOJ has misleadingly characterized

its import with the selective release. Significantly, the Goldsmith Memorandum goes to the heart

of important separation-of-powers arguments that the U.S. Supreme Court will entertain on

January 13, 2014 in NLRB v. Noel Canning (12-1281). In support of this complaint and to

prevent the U.S. Supreme Court and public from being misled by the selective release of the

Goldsmith Memorandum, Professor Samahon alleges the following:

1

## PARTIES

1.      Professor Tuan Samahon is a U.S. citizen and a resident of the judicial district embraced by the U.S. District Court for the Eastern District of Pennsylvania.  He is a tenured professor at Villanova University School of Law, Villanova, PA, where he researches in the field of federal separation of powers. This litigation arises out of his research into the scope of the President's recess appointments power and the pending U.S. Supreme Court case, NLRB v. Noel Canning (12-1281).  At issue here is a heavily redacted memorandum for then-U.S. Attorney General Alberto Gonzales signed by Assistant Attorney General Jack Goldsmith III and dated February 20, 2004 (the "Goldsmith Memorandum"). *See* attach. 1. Current Assistant Attorney General Virginia Seitz heavily relied on the Goldsmith Memorandum in her January 6, 2012 published memorandum opinion, "Lawfulness of Recess Appointments During a Recess Session of the Senate Notwithstanding Periodic Pro Forma Sessions" (the "Seitz Memorandum"). *See* attach. 2. This case arises out of Professor Samahon's FOIA request to obtain an unredacted copy of the Goldsmith Memorandum (FOIA request tracking number FY13-061) upon which Seitz selectively relied.

2.      Defendant DOJ (Defendant) is an executive agency of the U.S. Government.

## JURISDICTION

3.      This court has subject matter jurisdiction over this case and personal jurisdiction over the Defendant.  5 U.S.C. § 552(a)(4)(B).

4.      This court also has jurisdiction over this subject matter pursuant to federal question jurisdiction. 28 U.S.C. § 1331. This complaint arises under the laws of the United States and seeks to compel Defendant to produce an agency record improperly withheld from Professor Samahon.

## VENUE

5.      The Eastern District of Pennsylvania is the proper venue for this civil action pursuant to 5 U.S.C. § 552(a)(4)(B).  Professor Samahon resides in Lower Merion Township, Montgomery County, PA within this judicial district.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

6.      Professor Samahon has exhausted his administrative remedies.  5 U.S.C. § 552(a)(6)(C)(i).

7.      On July 15, 2013, he filed a FOIA request for an unredacted copy of the Goldsmith Memorandum. *See* attach. 3.

8.      Assistant Attorney General Seitz had relied upon the Goldsmith Memorandum in her published opinion available to the public. The Seitz Memorandum explicitly references the Goldsmith Memorandum in its text on pages 1, 5, 6, and 21, as well as in footnotes 1 and 13.

9.      The version of the Goldsmith Memorandum previously released is redacted so that only seven sentences of the three-page memorandum are readable.

10.     On July 19, 2013, Defendant declined to release the requested version of the Goldsmith Memorandum in a letter signed by Special Counsel Paul P. Colborn, asserting FOIA "Exemption 5." 5 U.S.C. § 552(b)(5). *See* attach. 4. Exemption 5 protects inter-agency or intra-agency memoranda that would be protected by law in litigation against the agency. It encompasses what is often referred to as the "deliberative process" and attorney-client privileges. OLC claimed exemption against disclosure on the basis of both privileges.

11.     On July 26, 2013, Professor Samahon timely appealed this denial to the DOJ's Office of Information Policy (OIP), *see* attach. 5, but OIP denied that administrative appeal on September 10, 2013. *See* attach. 6.

## TIMELY COMMENCEMENT OF CIVIL ACTION

12.     Professor Samahon timely commences this civil action within the six-year statute of limitations. 28 U.S.C. § 2401(a).

## STATEMENT OF FACTS

### *The President's January 4, 2012 Appointments*

13.     On January 4, 2012, President Barack Obama appointed Sharon Block, Terrence Flynn, and Richard Griffin to fill vacancies on the National Labor Relations Board (NLRB). None of these appointments of principal officers were subject to Senate confirmation.

14.     The Obama Administration contends that these appointments were valid without Senate advice and consent because January 4, 2012 fell during the Senate's annual winter adjournment and therefore the appointments were "recess" appointments.

15.     Although the Constitution permits recess appointments, U.S. Const. art. II, § 2, cl. 3, Presidents have traditionally not appointed during breaks shorter than ten days, let alone during periods when the Senate has said it is in *pro forma* session.

16.     The Senate's winter adjournment traditionally lasts a few weeks. The House of Representatives, however, did not assent to the 2011-12 winter adjournment. Therefore, the Senate held *pro forma* sessions every three days to meet its constitutional obligation. U.S. Const. art. I, § 5, cl. 4.

17.     Despite the *pro forma* sessions, the Administration contends that the Senate was functionally in recess for its entire 2012 winter adjournment and the President was thereby entitled to make the January 4, 2012 appointments. *See* attach. 2.

18.     A number of academics, commentators, and former government officials disputed the President's contention that he could constitutionally make these appointments.  The President's appointment triggered a deluge of litigation resulting in the Third Circuit, Fourth Circuit, and the

D.C. Circuit all declaring the appointments to be unconstitutional.  Over sixty U.S. Court of Appeals cases are currently pending on this issue.

19      The Supreme Court has taken up the issue by granting certiorari to <u>NLRB v. Noel Canning</u>, which will be argued shortly on January 13, 2014.

<em><u>The Memoranda at Issue</u></em>

20.     On January 12, 2012, as part of their public response to the legal and political disputes surrounding these appointments, OLC published the Seitz Memorandum, which defended the President's use of recess appointment power to make the January 4, 2012 appointments. *See* attach 2.

21.     The Seitz Memorandum was dated January 6, 2012. *Id.*

22.     The Seitz Memorandum relied upon a number of OLC memoranda, including the 2004 Goldsmith Memorandum, which it repeatedly cited. *Id.*

23.     The January 6, 2012 Seitz Memorandum indicated that it was merely a memorialization of advice previously given to the President on January 4, 2012.  *Id.* The administration released publically the Seitz Memorandum and adopted the opinions contained within the memorandum.

<em><u>The Governments Reliance upon the Seitz Memorandum in NLRB v. Noel Canning</u></em>

24.     As noted, the President's January 4, 2012 appointments have generated substantial litigation.  <u>NLRB v. Noel Canning</u> is the most consequential of these many cases.

25.     On January 25, 2013, the U.S. Court of Appeals for the District of Columbia decided <u>Noel Canning v. NLRB</u>, 705 F.3d 490 (D.C. Cir. 2013). That court held that the President's January 4, 2012 appointments to the NLRB were constitutionally invalid.

26.     On May 16, 2013, the U.S. Court of Appeals for the Third Circuit also declared unconstitutional the current administration's so-called "recess" appointments of Craig Becker to the NLRB. NLRB v. New Vista Nursing and Rehabilitation, 719 F.3d 203 (3d Cir. 2013).

27.     On July 17, 2013, the U.S. Court of Appeals for the Fourth Circuit joined the D.C. Circuit and Third Circuit in declaring unconstitutional the current administration's "recess" appointments. NLRB v. Enterprise Leasing Co. Southeast, LLC, 722 F.3d 609 (4th Cir. 2013).

28.     On June 24, 2013, the Supreme Court granted the NLRB's petition for a writ of certiorari in NLRB v. Noel Canning, 133 S.Ct. 2861 (2013).

29.     In securing this certiorari review, the NLRB relied upon the Seitz Memorandum and the incorporated Goldsmith Memorandum material on no less than five occasions in its Petition for Writ of Certiorari to the Supreme Court.

30.     Former Assistant Attorney General Goldsmith, the signatory author of the Goldsmith Memorandum sought in this litigation, has written a blog post suggesting the Obama administration's selective transparency misleads the public about OLC's actual advice to the President. *See* attach. 7.

31.     The current Administration has cited a few select lines of the Goldsmith Memorandum in order to convey the appearance that Bush administration legal advice supports the Seitz Memorandum's conclusion authorizing the appointment.

32.     In NLRB v. Noel Canning, the Solicitor General's Office has argued on page ten in its Supreme Court merits brief that recent presidencies have not accepted (and thereby acquiesced to) the view that the Senate properly uses pro-forma sessions to prevent recess appointments. It claims that the Bush administration, which would have included Goldsmith's Office of Legal

Counsel, never acknowledged the legitimacy of Senate pro-forma sessions as a means of preventing recess appointments.

33.     The U.S. Supreme Court, in its certiorari grant, asked the parties to address whether the President's recess-appointment power may be exercised when the Senate is convening every three days in pro forma sessions.

34.     The Supreme Court will decide a case of significant constitutional import concerning competing asserted claims of executive and legislative acquiescence, in part, on the basis of the Seitz Memorandum and its reliance on the selectively redacted Goldsmith Memorandum.

*Professor Samahon's FOIA Request, Denial, and Appeal*

35.     On July 15, 2013, Professor Samahon requested an unredacted version of the Goldsmith memorandum. On July 19, 2013, OLC denied that request pursuant to FOIA Exemption Five, 5 U.S.C. § 552(b)(5), citing the deliberative process and attorney-client privileges.

36.     On July 26, 2013, Professor Samahon appealed OLC's decision to OIP. On September 10, 2013, that appeal was denied.

37.     On a prior occasion in January 2007, OIP ordered the release of a number of OLC memoranda to Professor Samahon. *See* attach. 8.

38.     Professor Samahon had noted that subsequent memoranda cited the earlier memoranda. OIP Director Daniel Metcalfe stated that OIP made the release based on "information submitted in support of [Professor Samahon's] administrative appeal" in a letter accompanying that release. Similarly, Professor Samahon's 2013 appeal to OIP concerning the Goldsmith Memorandum made a substantially similar argument that reliance on the prior opinion constituted an exception to withholding under Exemption 5.

39.     New York Times journalist Charlie Savage similarly sought the Goldsmith Memorandum in FOIA litigation. New York Times Co. v. U.S. Dep't of Justice, No. 12 Civ. 3215 (JSR) (S.D.N.Y. Jan. 7, 2013), 2013 WL 174222. His case predated the D.C., Third, and Fourth Circuit opinions; the certiorari grant to the U.S. Supreme Court; and the representations made by the Obama Administration about the executive branch's view of recess appointments during Senate pro-form sessions.

40.     The decision to withhold the redacted portions of the Goldsmith Memorandum has led to considerable controversy and doubt over the accuracy and validity of its use as a supporting document in the Seitz Memorandum. This controversy has the potential to substantially affect the Supreme Court's opinion in NLRB v. Noel Canning and can only be resolved with the release of a fully unredacted version of the Goldsmith memorandum.

## CLAIM ONE: VIOLATION OF FOIA

41.     Professor Samahon repeats paragraphs 1-40 and incorporates them into this complaint.

42.     He has a statutory right to access an unredacted copy of the memorandum he requested under FOIA.  Defendants' failure to provide an unredacted version of the memorandum violates FOIA. 5 U.S.C. § 552, et seq.

43.     Defendants have no lawful basis for withholding the documents under 5 U.S.C. § 552(b)(5).

44.     The Goldsmith Memorandum is no longer subject to the deliberative process privilege because it was relied upon and repeatedly cited to in the Seitz memorandum, which has itself been adopted by the administration.

45.    The Goldsmith Memorandum has been adopted by the administration through public comments and the NLRB's reliance upon the Seitz Memorandum in NLRB's Petition for Writ of Certiorari in NLRB v. Noel Canning.

46.    The Administration adopted the analysis contained and cited within the Seitz Memorandum, including the Goldsmith Memorandum because, as stated by the Administration's representatives and according to the Seitz Memorandum itself, the Seitz Memorandum was a memorialization of oral advice given to the President prior to making the controversial appointments.

47.    The Goldsmith Memorandum is not subject to the deliberative process privilege because it is properly categorized as the Obama Administration's "working law" as an ex post policy statement.

48.    The importance of government transparency is paramount in this case because of the possible effect the content of the Goldsmith memorandum has on the pending NLRB v. Noel Canning Supreme Court opinion.

49.    Defendant irreparably harms Professor Samahon and the public by failing to provide a timely unredacted version of the Goldsmith memorandum. This harm will continue unless the Court compels Defendant to conform to the FOIA statute.

## CLAIM TWO: VIOLATION OF APA

50.    Professor Samahon repeats paragraphs 1-40 and incorporates them by reference.

51.    OIP's denial of Professor Samahon's request to disclose the redacted materials constitutes agency action unlawfully and unreasonably divergent from its previous decisions in violation of the Administrative Procedure Act.  This failure is arbitrary, capricious, an abuse of

discretion, not in accordance with the law, short of statutory right, without observance required

by law, and unwarranted by the facts.  5 U.S.C. §§ 701-06.

## REQUEST FOR RELIEF

Professor Samahon requests the following relief against Defendant:

1.) A judgment declaring or determining that Defendant's failure to provide him with the

requested document was unlawful;

2.) Injunctive relief requiring Defendant to promptly provide him and the U.S. Supreme Court

with the release of an unredacted version of the document;

3.) All attorney's fees and costs incurred in connection with this proceeding as provided by 5

U.S.C. § 552(a)(4)(E); and

4.) Any and all further relief that this Court may deem appropriate.


Respectfully submitted,


M. Beth Lyon
Professor of Law
Villanova University School of Law
299 North Spring Mill Road
Villanova, PA 19085-1516

# Attachment 1



U.S. Department of Ju

Office of Legal Counsel

Office of the Assistant Attorney General

*Washington, D.C. 20530*

February 20, 2004

## MEMORANDUM FOR ALBERTO R. GONZALES
## COUNSEL TO THE PRESIDENT

*Re: Recess Appointments in the Current Recess of the Senate*

You have asked for our opinion whether the President may make recess appointments during the current intrasession recess of the Senate. We believe that he may.

The number of days in a recess period is ordinarily calculated by counting the calendar days running from the day after the recess begins and including the day the recess ends.

The executive branch has long taken the position that a recess during a session of the Senate, at least if it is of sufficient length, can be a "Recess" within the meaning of the Recess Appointments Clause.



We believe that [REDACTED] supports the President's authority to make recess appointments during the current 11-day recess.



Arguably, the three days set by the Constitution as the time during which one House may adjourn without the consent of the other, U.S. Const. art. I, § 5, cl. 4, is also the length of time amounting to a "Recess" under the Recess Appointments Clause.

Please let us know if we may be of further assistance.

*Jack L. Goldsmith III*

Jack L. Goldsmith III
Assistant Attorney General

3

# Attachment 2

# LAWFULNESS OF RECESS APPOINTMENTS DURING A RECESS OF THE SENATE NOTWITHSTANDING PERIODIC PRO FORMA SESSIONS

*The convening of periodic pro forma sessions in which no business is to be conducted does not have the legal effect of interrupting an intrasession recess otherwise long enough to qualify as a "Recess of the Senate" under the Recess Appointments Clause. In this context, the President therefore has discretion to conclude that the Senate is unavailable to perform its advise-and-consent function and to exercise his power to make recess appointments.*

January 6, 2012

## MEMORANDUM OPINION FOR THE COUNSEL TO THE PRESIDENT

On December 17, 2011, the Senate agreed by unanimous consent to "adjourn and convene for pro forma sessions only, with no business conducted," every Tuesday and Friday between that date and January 23, 2012. 157 Cong. Rec. S8783 (daily ed. Dec. 17, 2011). During that period, on January 3, 2012, the Senate convened one such pro forma session to begin the second session of the 112th Congress and adjourned less than a minute later under its prior agreement. 158 Cong. Rec. S1 (daily ed. Jan. 3, 2012); *see also* U.S. Const. amend. XX, § 2. You asked whether the President has authority under the Recess Appointments Clause, U.S. Const. art. II, § 2, cl. 3, to make recess appointments during the period between January 3 and January 23 notwithstanding the convening of periodic pro forma sessions. We advised you that he does. This opinion memorializes and elaborates on that advice.

This Office has consistently advised that "a recess during a session of the Senate, at least if it is sufficient length, can be a 'Recess' within the meaning of the Recess Appointments Clause" during which the President may exercise his power to fill vacant offices. Memorandum for Alberto R. Gonzales, Counsel to the President, from Jack L. Goldsmith III, Assistant Attorney General, Office of Legal Counsel, *Re: Recess Appointments in the Current Recess of the Senate* at 1 (Feb. 20, 2004) ("Goldsmith Memorandum").[1] Although the Senate will have held pro forma sessions regularly from January 3 through January 23, in our judgment, those sessions do not interrupt the intrasession recess in a manner that would preclude the President from determining that the Senate remains unavailable throughout to "'receive communications from the President or participate as a body in making appointments.'" *Intrasession Recess Appointments*, 13 Op. O.L.C. 271, 272 (1989) (quoting *Executive Power—Recess Appointments*, 33 Op. Att'y Gen. 20, 24 (1921) ("Daugherty Opinion")). Thus, the President has the authority under the Recess Appointments Clause to make appointments during this period. The Senate could remove the basis for the President's exercise of his recess appointment authority by remaining continuously in session and being available to receive and act on nominations, but it cannot do so by providing for pro forma sessions at which no business is to be conducted.

---

[1] "A recess between sine die adjournment of one session and the convening of the next is also known as an intersession recess. A recess within a session is also known as an intrasession recess." Henry B. Hogue & Richard S. Beth, Cong. Research Serv., *Efforts to Prevent Recess Appointments Through Congressional Scheduling and Historical Recess Appointments During Short Intervals Between Sessions* 3 n.6 (2011). "The number of days in a recess period is ordinarily calculated by counting the calendar days running from the day after the recess begins and including the day the recess ends." Goldsmith Memorandum at 1.

## I.

Beginning in late 2007, and continuing into the 112th Congress, the Senate has frequently conducted pro forma sessions during recesses occurring within sessions of Congress. These pro forma sessions typically last only a few seconds, and apparently require the presence of only one Senator.[2] Senate orders adopted by unanimous consent provide in advance that there is to be "no business conducted" at such sessions. *See, e.g.*, 157 Cong. Rec. S8783 (daily ed. Dec. 17, 2011); *id.* at S7876 (daily ed. Nov. 18, 2011); *id.* at S6891 (daily ed. Oct. 20, 2011); *id.* at S6009 (daily ed. Sept. 26, 2011); *id.* at S5292 (daily ed. Aug. 2, 2011); *id.* at S3465 (daily ed. May 26, 2011); 156 Cong. Rec. S7775 (daily ed. Sept. 29, 2010); 154 Cong. Rec. S10,958 (daily ed. Dec. 11, 2008); *id.* at S10,776 (daily ed. Nov. 20, 2008); *id.* at S8077 (daily ed. Aug. 1, 2008); *id.* at S2194 (daily ed. Mar. 13, 2008); *id.* at S1085 (daily ed. Feb. 14, 2008); 153 Cong. Rec. S16,069 (daily ed. Dec. 19, 2007); *id.* at S14,661 (daily ed. Nov. 16, 2007); *accord* 154 Cong. Rec. S4849 (daily ed. May 22, 2008) (recess order stating that "no action or debate" is to occur during pro forma sessions).[3] The Senate Majority Leader has stated that such pro forma sessions break a long recess into shorter adjournments, each of which might ordinarily be deemed too short to be considered a "recess" within the meaning of the Recess Appointments Clause, thus preventing the President from exercising his constitutional power to make recess appointments. *See* 154 Cong. Rec. S7558 (daily ed. July 28, 2008) (statement of Sen. Reid); *see also* 153 Cong. Rec. S14609 (daily ed. Nov. 16, 2007) (statement of Sen. Reid) ("[T]he Senate will be coming in for pro forma sessions . . . to prevent recess appointments.").

While this practice was initiated by Senate action, more recently the Senate's use of such sessions appears to have been forced by actions of the House of Representatives. *See generally* Henry B. Hogue & Richard S. Beth, Cong. Research Serv., *Efforts to Prevent Recess Appointments Through Congressional Scheduling and Historical Recess Appointments During Short Intervals Between Sessions* 5-8 (2011). On May 25, 2011, twenty Senators noted the Senate's use of pro forma sessions in 2007 and "urge[d] [the Speaker of the House] to refuse to pass any resolution to allow the Senate to recess or adjourn for more than three days for the remainder of the [P]resident's term." Press Release, Senator David Vitter, *Vitter, DeMint Urge House to Block Controversial Recess Appointments* (May 25, 2011), *available at* http://vitter.senate.gov/public/index.cfm?FuseAction=PressRoom. PressReleases. The next month, eighty Representatives similarly requested that the Speaker, House Majority Leader, and House Whip take "all appropriate measures . . . to prevent any and all recess appointments by preventing the Senate from officially recessing for the remainder of the 112th Congress."

---

[2] *See, e.g.*, 157 Cong. Rec. D1404 (daily ed. Dec. 30, 2011) (noting that day's pro forma session lasted from 11:00:02 until 11:00:34 a.m.); *id.* at D903 (daily ed. Aug. 12, 2011) (noting that day's pro forma session lasted from 12:00:08 until 12:00:32 p.m.); 156 Cong. Rec. D1067 (daily ed. Oct. 26, 2010) (noting that day's pro forma session lasted from 12:00:04 until 12:00:31 p.m.); 154 Cong. Rec. D1257 (daily ed. Oct. 30, 2008) (noting that day's pro forma session lasted from 9:15:00 until 9:15:08 a.m.); *id.* at D665 (daily ed. May 27, 2008) (noting that day's pro forma session lasted from 9:15:02 until 9:15:31 a.m.).

[3] We are aware of only two occasions in this period in which a Senate order did not provide that no business would be conducted in pro forma sessions held during a recess. On the first, the relevant order provided that there would be "no business conducted, except with the concurrence of the two leaders," 154 Cong. Rec. S10,504 (daily ed. Oct. 2, 2008); on the second, the relevant order was silent, *id.* at S6336 (daily ed. June 27, 2008). It is unclear, however, whether the use of pro forma sessions on the latter occasion was intended to prevent recess appointments, as only one pro forma session was scheduled during the ten-day recess. *See id.*

*Lawfulness of Recess Appointments During a Recess of the Senate*
*Notwithstanding Periodic Pro Forma Sessions*

Letter to John Boehner, Speaker of the House, et al., from Jeff Landry, Member of Congress (June 15, 2011), *available at* http://landry.house.gov/sites/landry.house.gov/files/documents/Freshmen%20Recess%20Appointment%20Letter.pdf. Consistent with these requests, "no concurrent resolution of adjournment ha[s] been introduced in either chamber since May 12, 2011." Henry B. Hogue, Cong. Research Serv., RS21308, *Recess Appointments: Frequently Asked Questions* 3 (rev. Dec. 12, 2011). And because the Constitution provides that "[n]either House, during the Session of Congress, shall, without the Consent of the other, adjourn for more than three days," U.S. Const. art. I, § 5, cl. 4, both Houses have convened pro forma sessions during periods of extended absence.

Public statements by some Members of the Senate reveal that they do not consider these pro forma sessions to interrupt a recess. *See, e.g.*, 157 Cong. Rec. S6826 (daily ed. Oct. 20, 2011) (statement of Sen. Inhofe) (referring to the upcoming "1-week recess"); *id.* at S5035 (daily ed. July 29, 2011) (statement of Sen. Thune) (calling on the Administration to send trade agreements to Congress "before the August recess" even though "[w]e are not going to be able to consider these agreements until September"); *id.* at S4182 (daily ed. June 29, 2011) (statement of Sen. Sessions) ("Now the Senate is scheduled to take a week off, to go into recess to celebrate the Fourth of July . . . ."); 156 Cong. Rec. at S8116-17 (daily ed. Nov. 19, 2010) (statement of Sen. Leahy) (referring to the period when "the Senate recessed for the elections" as the "October recess"); 154 Cong. Rec. S7984 (daily ed. Aug. 1, 2008) (statement of Sen. Hatch) (referring to upcoming "5-week recess"); *id.* at S7999 (daily ed. Aug. 1, 2008) (statement of Sen. Dodd) (noting that Senate would be in "adjournment or recess until the first week in September"); *id.* at S7713 (daily ed. July 30, 2008) (statement of Sen. Cornyn) (referring to the upcoming "month-long recess"); *see also id.* at S2193 (daily ed. Mar. 13, 2008) (statement of Sen. Leahy) (referring to the upcoming "2-week Easter recess").

Likewise, the Senate as a body does not uniformly appear to consider its recess broken by pre-set pro forma sessions. The Senate's web page on the sessions of Congress, which defines a recess as "a break in House or Senate proceedings of three days or more, excluding Sundays," treats such a period of recess as unitary, rather than breaking it into three-day segments. *See* United States Senate, The Dates of Sessions of the Congress, http://www.senate.gov/reference/Sessions/sessionDates.htm. The Congressional Directory of the 112th Congress, published by Congress, *see* 44 U.S.C. § 721(a), does the same. *See 2011-2012 Congressional Directory* 538 n.2 (Joint Comm. on Printing, 112th Cong., comp. 2011). More substantively, despite the pro forma sessions, the Senate has taken special steps to provide for the appointment of congressional personnel during longer recesses (including this one), indicating that the Senate recognizes that it is not in session during this period for the purpose of making appointments under ordinary procedures.[4] And when messages are received from the President during the

---

[4] *See, e.g.*, 157 Cong. Rec. S8783 (daily ed. Dec. 17, 2011) (providing that "notwithstanding the upcoming recess or adjournment of the Senate, the President of the Senate, the President pro tempore, and the majority and minority leaders [are] authorized to make appointments to commissions, committees, boards, conferences, or interparliamentary conferences authorized by the law, by concurrent action of the two Houses, or by order of the Senate"); *id.* at S7876 (daily ed. Nov. 18, 2011) (similar); *id.* at S5292 (daily ed. Aug. 2, 2011) (similar); *id.* at S3463 (daily ed. May 26, 2011) (similar); 156 Cong. Rec. S7775 (daily ed. Sept. 29, 2010) (similar); 154 Cong Rec. S10,958 (daily ed. Dec. 11, 2008) (similar); *id.* at S10,776 (daily ed. Nov. 20, 2008) (similar); *id.* at S10,427 (daily ed. Oct. 2, 2008) (similar); *id.* at S8077 (daily ed. Aug. 1, 2008) (similar); *id.* at S6332 (daily ed. June 27, 2008)

recess, they are not laid before the Senate and entered into the Congressional Record until the Senate returns for a substantive session, even if pro forma sessions are convened in the meantime.[5]  On the other hand, we have been informed that at least during the August 2008 recess, the Senate Executive Clerk did not return pending nominations when the Senate went into recess pursuant to Senate Standing Rule XXXI, which provides for the return of nominations that have not been acted upon when the Senate recesses "for more than thirty days."  Senate Rule XXXI(6), Standing Rules of the Senate, *in Senate Manual*, S. Doc. No. 112-1, at 58 (2011) ("Senate Standing Rules").  This omission may reflect the Executive Clerk's treatment of that impending recess as a series of shorter adjournments rather than a single thirty-eight-day recess.

## II.

To address the President's authority to make recess appointments during a recess including pro forma sessions, we consider two distinct issues:  The first is whether the President has authority to make a recess appointment during the recess at issue here, an intrasession recess of twenty days.  We conclude that he does.  The opinions of the Attorney General and this Office, historical practice, and the limited judicial authority that exists all provide strong support for that conclusion.

Thereafter, we consider whether the President is disabled from making an appointment when the recess is punctuated by periodic pro forma sessions at which Congress has declared in advance that no business is to be conducted.  Based primarily on the traditional understanding that the Recess Appointments Clause is to be given a practical construction focusing on the Senate's ability to provide advice and consent to nominations, we conclude that while Congress can prevent the President from making any recess appointments by remaining continuously in session and available to receive and act on nominations, it cannot do so by conducting pro forma sessions during a recess.  The question is a novel one, and the substantial arguments on each side create some litigation risk for such appointments.  We draw on the analysis developed by this Office when it first considered the issue.  *See* Memorandum to File, from John P. Elwood, Deputy Assistant Attorney General, Office of Legal Counsel, *Re:  Lawfulness of Making Recess Appointment During Adjournment of the Senate Notwithstanding Periodic "Pro Forma Sessions"* (Jan. 9, 2009).

---

(similar); *id.* at S4848 (daily ed. May 22, 2008) (similar); *id.* at S2190 (daily ed. Mar. 13, 2008) (similar); *id.* at S1085 (daily ed. Feb. 14, 2008) (similar); 153 Cong. Rec. S16,060 (daily ed. Dec. 19, 2007) (similar); *id.* at S14,655 (daily ed. Nov. 16, 2007) (similar).  The Senate has taken similar steps before recesses that are not punctuated by pro forma sessions.  *See, e.g.,* 156 Cong. Rec. S6974 (daily ed. Aug. 5, 2010) (providing for appointment authority before an intrasession recess expected to last for thirty-nine days); 153 Cong. Rec. S10,991 (daily ed. Aug. 3, 2007) (same, recess of thirty-two days).

[5]  *See, e.g.,* 157 Cong. Rec. S7905 (daily ed. Nov. 28, 2011) (message from the President "received during adjournment of the Senate on November 21, 2011," laid before the Senate); *id.* at S7881 (daily ed. Nov. 25, 2011) (record of pro forma session with no mention of receipt of presidential message); *id.* at S7879 (daily ed. Nov. 22, 2011) (same); S6916 (daily ed. Oct. 31, 2011) (message from the President "received during adjournment of the Senate on October 25, 2011," laid before the Senate); *id.* at S6895 (daily ed. Oct. 27, 2011) (record of pro forma session with no mention of receipt of presidential message).

*Lawfulness of Recess Appointments During a Recess of the Senate*
*Notwithstanding Periodic Pro Forma Sessions*

### A.

The Recess Appointments Clause of the Constitution provides that "[t]he President shall have Power to fill up all Vacancies that may happen during the Recess of the Senate, by granting Commissions which shall expire at the End of their next Session." U.S. Const. art. II, § 2, cl. 3. The Department of Justice "has long interpreted the term 'recess' to include intrasession recesses if they are of substantial length." *Intrasession Recess Appointments*, 13 Op. O.L.C. at 272; *see also* Goldsmith Memorandum at 1-2; *Recess Appointments During an Intrasession Recess*, 16 Op. O.L.C. 15, 15-16 (1992); *Recess Appointments—Compensation (5 U.S.C. § 5503)*, 3 Op. O.L.C. 314, 316 (1979); *Recess Appointments*, 41 Op. Att'y Gen. 463, 468 (1960); Daugherty Opinion, 33 Op. Att'y Gen. at 21-22, 25.

Under a framework first articulated by Attorney General Daugherty in 1921, and subsequently reaffirmed and applied by several opinions of the Attorney General and this Office, the "constitutional test for whether a recess appointment is permissible is whether the adjournment of the Senate is of such duration that the Senate could 'not receive communications from the President or participate as a body in making appointments.'" *Intrasession Recess Appointments*, 13 Op. O.L.C. at 272 (quoting Daugherty Opinion, 33 Op. Att'y Gen. at 24).[6] Although "the line of demarcation can not be accurately drawn" in determining whether an intrasession recess is of sufficient length to permit the President to make a recess appointment, "the President is necessarily vested with a large, although not unlimited, discretion to determine when there is a real and genuine recess making it impossible for him to receive the advice and consent of the Senate." Daugherty Opinion, 33 Op. Att'y Gen. at 25; *see also id.* ("Every presumption is to be indulged in favor of the validity of whatever action [the President] may take."); *The Constitutional Separation of Powers Between the President and Congress*, 20 Op. O.L.C. 124, 161 (1996) ("Dellinger Opinion") ("[T]he President has discretion to make a good-faith determination of whether a given recess is adequate to bring the Clause into play."). "Ultimately, resolution of the question whether an adjournment is of sufficient duration to justify recess appointments requires the application of judgment to particular facts." *Intrasession Recess Appointments*, 13 Op. O.L.C. at 273.

We have little doubt that a twenty-day recess may give rise to presidential authority to make recess appointments. Attorneys General and this Office have repeatedly affirmed the

---

[6]  In 1868, Attorney General Evarts approved the contemplated appointments of three officials during a fifty-six-day intrasession recess of the Senate without remarking upon the nature of the recess. *See Case of District Attorney for Eastern District of Pennsylvania*, 12 Op. Att'y Gen. 469, 469-70 (1868) (observing that the office "is now vacant during the recess of the Senate" and opining that "it is competent for the President to grant a commission"); *see also Case of the Collectorship of New Orleans*, 12 Op. Att'y Gen. 449 (1868); *Case of the Collectorship of Customs for Alaska*, 12 Op. Att'y Gen. 455 (1868). It is possible that Attorney General Evarts was not aware that the Senate had merely adjourned to a date certain: he referred in each opinion to the "late session" of the Senate. *See, e.g.*, 12 Op. Att'y Gen. at 451. Attorney General Knox, too, was apparently unaware of this fact when he cited one of these opinions to support his conclusion that it is only the "period following the final adjournment for the session which is *the recess* during which the President has power to fill vacancies" and remarked that "[t]he opinions of Mr. Wirt . . . and all the other opinions on this subject relate only to appointments during the recess of the Senate between two sessions of Congress." *Appointments of Officers—Holiday Recess*, 23 Op. Att'y Gen. 599, 601-02 (1901). The Daugherty Opinion reversed Attorney General Knox's conclusion about appointments in intrasession recesses.

President's authority to make recess appointments during intrasession recesses of similar or shorter length. *See, e.g.*, Goldsmith Memorandum at 2-3 (recognizing President's authority to make a recess appointment during an intrasession recess of eleven days); *Recess Appointments During an Intrasession Recess*, 16 Op. O.L.C. at 15-16 (same, eighteen days) *Intrasession Recess Appointments*, 13 Op. O.L.C. at 272-73 (thirty-three days); *Recess Appointments*, 41 Op. Att'y Gen. at 464-65 (thirty-six days); Daugherty Opinion, 33 Op. Att'y Gen. at 25 (twenty-eight days).[7]

The recess appointment practice of past Presidents confirms the views expressed in these opinions. *See American Ins. Ass'n v. Garamendi*, 539 U.S. 396, 414 (2003) (relying on the accumulated "historical gloss" to discern the scope of presidential authority where "the source of the President's power to act . . . does not enjoy any textual detail"); *see also Evans v. Stephens*, 387 F.3d 1220, 1225-26 (11th Cir. 2004) (en banc) (relying in part on historical practice to reject "the argument that the recess appointment power may only be used in an intersession recess"). Intrasession recesses were rare in the early years of the Republic; and when they occurred, they were brief. *See Congressional Directory* 522-25 (listing five intrasession recesses before the Civil War, ranging from five to twelve days in length). But as intrasession recesses became common, so too did intrasession recess appointments. President Johnson is believed to have made the first intrasession recess appointments in 1867. Henry B. Hogue, The Law: *Recess Appointments to Article III Courts*, 34 Presidential Stud. Q. 656, 666 (2004).[8] "The length of the recess may have triggered the appointments, because none of the intrasession recesses taken by the Senate until that time had lasted more than 15 days." *Id.* Presidents Harding and Coolidge each made intrasession recess appointments in the 1920s (during recesses of twenty-eight and fourteen days, respectively), *see* 61 Cong. Rec. 5646 (1921) (recess from Aug. 24, 1921, until Sept. 21, 1921); *id.* at 5737 (recess appointment to the Register of the Land Office made on Aug. 30, 1921); 69 Cong. Rec. 910 (1927) (recess from Dec. 21, 1927, until Jan. 4, 1928); Declaration of Ronald R. Geisler, Chief Clerk of the Executive Clerk's Office, Exhibit B, *Bowers v. Moffett*, Civ. Action No. 82-0195 (D.D.C. Jan. 22, 1982) (recess appointment to the Interstate Commerce Commission made January 3, 1928), and "[b]eginning in 1943, presidents started to routinely make recess appointments during long intrasession recesses." Hogue, 34 Presidential Stud. Q. at 666; *see also* 139 Cong. Rec. 15,273 (1993) (compilation of intrasession recess appointments

---

[7]  In 1985, the Office "cautioned against a recess appointment during [what was mistakenly believed to be] an 18-day intrasession recess," *Intrasession Recess Appointments*, 13 Op. O.L.C. at 273 n.2 (citing Memorandum for the Files, from Herman Marcuse, Attorney-Adviser, Office of Legal Counsel, *Re: Recess Appointments to the Export Import Bank* (Jan. 28, 1985) ("Marcuse Memorandum")). This reluctance was attributable in part to factors other than the length of the recess, and we did "not say that [the appointments] would be constitutionally invalid as a matter of law," Marcuse Memorandum at 1-3. Regardless, the caution was not heeded, and the appointments were made in a fourteen-day intrasession recess. *Id.* at 4.

[8]  As an analyst from the Congressional Research Service has explained, "it is virtually impossible" to identify all recess appointments before 1965, because before that date "recess appointments were recorded in a haphazard fashion." Memorandum for Senate Committee on Banking, Housing and Urban Affairs, from Rogelio Garcia, Analyst in American National Government, Government Division, Congressional Research Service, Library of Congress, *Re: Number of Recess Appointments, by Administration, From 1933 to 1984* at 1 (Mar. 13, 1985).

*Lawfulness of Recess Appointments During a Recess of the Senate*
*Notwithstanding Periodic Pro Forma Sessions*

from 1970 to 1993). The last five Presidents have all made appointments during intrasession recesses of fourteen days or fewer.[9]

There is significant (albeit not uniform) evidence that the Executive Branch's view that recess appointments during intrasession recesses are constitutional has been accepted by Congress and its officers. Most relevant, in our view, is the Pay Act, 5 U.S.C. § 5503 (2006), which sets out the circumstances in which a recess appointee may be paid a salary from the Treasury. The Attorney General has long taken the position that the Act constitutes congressional acquiescence to recess appointments under circumstances where the Act would permit payment. *See Recess Appointments*, 41 Op. Att'y Gen. at 466. In 1948, the Comptroller General considered whether the Act permitted the payment of officials appointed during an intrasession recess. *Appointments—Recess Appointments*, 28 Comp. Gen. 30 (1948). After acknowledging the "accepted view" that an intrasession recess "is a recess during which an appointment may properly be made," the Comptroller General concluded that the Act was intended to permit payment to all who are appointed "during periods when the Senate is not actually sitting and is not available to give its advice and consent in respect to the appointment, irrespective of whether the recess of the Senate is attributable to a final adjournment *sine die* or to an adjournment to a specified date." *Id.* at 34, 37. "Considering that the Comptroller General is an officer in the legislative branch, and charged with the protection of the fiscal prerogatives of the Congress, his full concurrence in the position taken by the Attorney General . . . is of signal significance," *Recess Appointments*, 41 Op. Att'y Gen. at 469, and in the more than sixty years since the opinion was issued, Congress has not amended the statute to compel a different result.[10]

---

[9] For example, using the method of counting explained above, *see supra* n. 1, President Obama made three recess appointments during a twelve-day recess; President George W. Bush made twenty-one appointments across several eleven-day recesses, four appointments during a twelve-day recess, and four appointments during a fourteen-day recess; President Clinton made one recess appointment during a ten-day recess, another appointment during an eleven-day recess, and seventeen appointments across several twelve-day recesses; President George H.W. Bush made fourteen appointments during a thirteen-day recess; and President Reagan made two appointments during a fourteen-day recess. *See Press Release, President Obama Announces Recess Appointments to Key Administration Positions* (July 7, 2010), *available at* http://www.whitehouse.gov/the-press-office/president-obama-announces-recess-appointments-key-administration-positions-0; Henry B. Hogue & Maureen Bearden, Cong. Research Serv., RL33310, *Recess Appointments Made by President George W. Bush, January 20, 2001-October 31, 2008*, at 9-10 (2008); Rogelio Garcia, Cong. Research Serv., RL30821, *Recess Appointments Made by President Clinton* 9 (2001); Rogelio Garcia, Cong. Research Serv., *Recess Appointments Made by President George Bush* 3 (1996); Rogelio Garcia, Cong. Research Serv., *Recess Appointments Made by President Reagan* 8 (1988).

[10] Certain language in an 1863 report of the Senate Judiciary Committee could be read to suggest that the Committee believed that recess appointments could be made only during intersession recesses. *See* S. Rep. No. 37-80, at 3 (1863) ("It cannot, we think, be disputed that the period of time designated in the clause as 'the recess of the Senate,' includes the space beginning with the indivisible point of time which next follows that at which it adjourned, and ending with that which next precedes the moment of the commencement of their next session."). But the question addressed by the Committee in 1863 related to timing of the occurrence of the vacancy, not the nature of the recess during which the vacancy occurred. Moreover, a subsequent report by the Committee defined a recess functionally in terms that have since been adopted by the Attorney General and this Office as setting forth the test for determining when an intrasession recess is of sufficient length to give rise to the President's power under the Recess Appointments Clause. *See* S. Rep. No. 58-4389, at 2 (1905) (defining a recess as "the period of time . . .

7

*Opinions of the Office of Legal Counsel in Volume 36*

While there is little judicial precedent addressing the President's authority to make intrasession recess appointments, what decisions there are uniformly conclude that the President does have such authority. In the only federal court of appeals decision squarely on point, the en banc Eleventh Circuit upheld the recess appointment of a judge made during an eleven-day intrasession recess. *See Evans*, 387 F.3d at 1224-26 (concluding "Recess of the Senate" as used in the Recess Appointments Clause includes intrasession recesses and declining to set a lower limit on their length). *But see id.* at 1228 n.2 ("Although I would not reach this question, the text of the Constitution as well as the weight of the historical record strongly suggest that the Founders meant to denote only inter-session recesses." (Barkett, J., dissenting)). Lower courts, too, have recognized the President's power to make intrasession recess appointments. *See Nippon Steel Corp. v. Int'l Trade Comm'n*, 239 F. Supp. 2d 1367, 1374 n.13 (Ct. Int'l Trade 2002) ("The long history of the practice (since at least 1867) without serious objection by the Senate . . . demonstrates the legitimacy of these appointments."); *Gould v. United States*, 19 Ct. Cl. 593, 595-96 (1884) ("We have no doubt that a vacancy occurring while the Senate was thus temporarily adjourned . . . could be and was legally filled by the appointment of the President alone." (dictum)). The Supreme Court, however, has never decided the issue.[11]

Due to this limited judicial authority, we cannot predict with certainty how courts will react to challenges of appointments made during intrasession recesses, particularly short ones.[12] If an official appointed during the current recess takes action that gives rise to a justiciable claim, litigants might challenge the appointment on the ground that the Constitution's reference to "the Recess of the Senate" contemplates only the recess at the end of a session. That argument and the Department of Justice's response have been discussed at length during litigation over a judicial recess appointment. *See, e.g.*, Brief for the Intervenor United States, *Stephens*, 387 F.3d

---

when, because of its absence, [the Senate] can not receive communications from the President or participate as a body in making appointments"); *see also infra* p. 12.

A draft legal brief prepared, but never filed, by the Senate Legal Counsel in 1993 took the position that "the text and purpose of the Recess Appointments Clause both demonstrate that the recess power is limited to Congress' annual recess between sessions." 139 Cong. Rec. 15,267, 15,268 (1993). Because a resolution directing the Counsel to appear in the litigation was never offered, however, it is unclear whether the views expressed in the brief garnered the support of a majority of the Senate.

[11] Justice Stevens filed a statement respecting the denial of certiorari in *Evans* expressing his view that the "case . . . raises significant constitutional questions regarding the President's intrasession appointment" of a circuit judge and that "it would be a mistake to assume that our disposition of this petition constitutes a decision on the merits of whether the President has the constitutional authority to fill future Article III vacancies, such as vacancies on this Court, with appointments made absent consent of the Senate during short intrasession 'recesses.'" *Evans v. Stephens*, 544 U.S. 942, 942-43 (2005) (Stevens, J., respecting denial of certiorari). It is unclear whether the Justice's concerns related specifically to recess appointments of Article III judges or extended to executive branch appointments.

[12] Scholarly opinion is divided on the proper interpretation of the Recess Appointments Clause, although advocates for a more limited recess appointment power recognize that their view has not prevailed. *Compare* Edward A. Hartnett, *Recess Appointments of Article III Judges: Three Constitutional Questions*, 26 Cardozo L. Rev. 377, 424 (2005) ("[T]he recess appointment power is best understood as available during both intersession and intrasession Senate recesses of more than three days."), *with* Michael B. Rappaport, *The Original Meaning of the Recess Appointments Clause*, 52 UCLA L. Rev. 1487, 1487 (2005) (arguing that "the Constitution permits recess appointments only during an intersession recess," but acknowledging that "[t]he prevailing interpretation . . . allows the President to makes recess appointments . . . during intrasession recesses of ten days and perhaps of even shorter duration").

*Lawfulness of Recess Appointments During a Recess of the Senate
Notwithstanding Periodic Pro Forma Sessions*

1220 (No. 02-16424); Response Brief of Plaintiffs-Appellees and United States Senator Edward M. Kennedy as Amicus Curiae Supporting Plaintiffs-Appellees, *Stephens*, 387 F.3d 1220 (No. 02-16424); *see also supra* n. 12.

We conclude that the President's authority to make recess appointments extends to an intrasession recess of twenty days.

### B.

The second question we consider is whether Congress can prevent the President from making appointments during a recess by providing for pro forma sessions at which no business is to be conducted, where those pro forma sessions are intended to divide a longer recess into a series of shorter adjournments, each arguably too brief to support the President's recess appointment authority. We believe that Congress's provision for pro forma sessions of this sort does not have the legal effect of interrupting the recess of the Senate for purposes of the Recess Appointments Clause and that the President may properly conclude that the Senate is unavailable for the overall duration of the recess.[13]

### 1.

The Appointments Clause of the Constitution provides that the President "shall nominate, and by and with the Advice and Consent of the Senate, shall appoint Ambassadors, other public Ministers and Consuls, Judges of the supreme Court, and all other Officers of the United States." U.S. Const. art. II, § 2, cl. 2. The Recess Appointments Clause immediately follows and confers

---

[13] Because we conclude that pro forma sessions do not have this effect, we need not decide whether the President could make a recess appointment during a three-day intrasession recess. This Office has not formally concluded that there is a lower limit to the duration of a recess within which the President can make a recess appointment. Attorney General Daugherty suggested in dictum in his 1921 opinion that "an adjournment of 5 or even 10 days [could not] be said to constitute the recess intended by the Constitution," 33 Op. Att'y Gen. at 25. As a result, "[t]his Office has generally advised that the President not make recess appointments, if possible, when the break in continuity of the Senate is very brief," *The Pocket Veto: Historical Practice and Judicial Precedent*, 6 Op. O.L.C. 134, 149 (1982); *see, e.g., Recess Appointments—Compensation (5 U.S.C. § 5503)*, 3 Op. O.L.C. 314, 315-16 (1979) (describing informal advice against making recess appointments during a six-day intrasession recess in 1970). Notwithstanding Attorney General Daugherty's caution, we advised in 1996 that "recess appointments during [a] 10-day intrasession recess would be constitutionally defensible," although they would "pose significant litigation risks." Memorandum for John M. Quinn, Counsel to the President, from Walter Dellinger, Assistant Attorney General, Office of Legal Counsel, *Re: Recess Appointments* (May 29, 1996). And both this Office and the Department of Justice in litigation have recognized the argument that "the three days set by the Constitution as the time during which one House may adjourn without the consent of the other, U.S. Const. art. I, § 5, cl. 4, is also the length of time amounting to a 'Recess' under the Recess Appointments Clause." Goldsmith Memorandum at 3; Memorandum for John W. Dean III, Counsel to the President, from Leon Ulman, Deputy Assistant Attorney General, Office of Legal Counsel, *Re: Recess Appointments* at 3-4 (Dec. 3, 1971); Brief for the United States in Opposition at 11, *Evans v. Stephens*, 544 U.S. 942 (2005) (No. 04-828) ("[T]he Recess Appointments Clause by its terms encompasses all vacancies and all recesses (with the single arguable exception of *de minimis* breaks of three days or less, see U.S. Const. Art. I, § 5, Cl. 4)."); *infra* p. 23; *see also* Hartnett, 26 Cardozo L. Rev. at 424 ("[T]he recess appointment power is best understood as available during both intersession and intrasession Senate recesses of more than three days."). *But see* Brief for the United States at 14-18, *Mackie v. Clinton*, Civ. Action No. 93-0032-LFO (D.D.C. 1993) (arguing that "there is no lower time limit that a recess must meet to trigger the recess appointment power" (capitalization omitted)).

on the President the "Power to fill up all Vacancies that may happen during the Recess of the Senate, by granting Commissions which shall expire at the End of their next Session." *Id.* art. II, § 2, cl. 3. The Clause was adopted at the Constitutional Convention without debate. *See* 2 The Records of the Federal Convention of 1787, at 533, 540 (Max Farrand ed., rev. ed. 1966).[14] Alexander Hamilton described the Clause in *The Federalist* as providing a "supplement" to the President's appointment power, establishing an "auxiliary method of appointment, in cases to which the general method was inadequate." *The Federalist No. 67*, at 409 (Clinton Rossiter ed., 1961). The Clause was necessary because "it would have been improper to oblige [the Senate] to be continually in session for the appointment of officers," and it "might be necessary for the public service to fill [vacancies] without delay." *Id.* at 410.

Other contemporaneous writings likewise emphasize that the recess appointment power is required to address situations in which the Senate is unable to provide advice and consent on appointments. *See* 4 *The Debates in the Several State Conventions on the Adoption of the Federal Constitution as Recommended by the General Convention at Philadelphia in 1787*, at 135-36 (Jonathan Elliott ed., 2d ed. 1836) ("Elliott's Debates") (statement of Archibald Maclaine at North Carolina ratification convention) (July 28, 1788) ("Congress are not to be sitting at all times; they will only sit from time to time, as the public business may render it necessary. Therefore the executive ought to make temporary appointments, as well as receive ambassadors and other public ministers. This power can be vested nowhere but in the executive, because he is perpetually acting for the public; for, though the Senate is to advise him in the appointment of officers, &c., yet, during the recess, the President must do this business, or else it will be neglected; and such neglect may occasion public inconveniences."); *cf. Letters of Cato IV*, *reprinted in* 2 The Complete Anti-Federalist 114 (Herbert J. Storing ed., 1981) ("Though the president, during the sitting of the legislature, is assisted by the senate, yet he is without a constitutional council in their recess . . . .").[15] Thus, from the days of the Founding, the Recess Appointments Clause has been considered implicated when the Senate is not "in session for the appointment of officers." *The Federalist No. 67*, at 410.

---

[14] The Clause, which was proposed by a North Carolina delegate, is generally considered to have been based on a similar provision then in the North Carolina Constitution. *See* 2 David K. Watson, *The Constitution of the United States* 988 (1910) ("The [Recess Appointments Clause] was doubtless taken from the Constitution of North Carolina, which contained a similar clause.") (footnote omitted); Thomas A. Curtis, Note, *Recess Appointments to Article III Courts: The Use of Historical Practice in Constitutional Interpretation*, 84 Colum. L. Rev. 1758, 1770 n.71 (1984) (noting that the provision was proposed by a delegate from North Carolina; that the language tracks that of the North Carolina provision; and that the federal power is similar in scope to the power in North Carolina's Constitution at that time). Because the North Carolina *legislature* was then generally responsible for appointments, the executive could make appointments only when the legislature was not in session to do so.

[15] *See also* 2 Elliott's Debates 513 (statement of James Wilson at Pennsylvania ratification convention) ("[T]here is only left the power of concurring in the appointment of officers; then care is taken, in this Constitution, that this branch of business may be done without [the Senate's] presence"); *id.* at 534 (statement of Thomas M'Kean) (Dec. 11, 1787) ("Nor need the Senate be under any necessity of sitting constantly, as has been alleged; for there is an express provision made to enable the President to fill up all vacancies that may happen during their recess . . . ."); 3 Elliott's Debates 409-10 (statement of James Madison at the Virginia convention) ("There will not be occasion for the continual residence of the senators at the seat of government. . . . It is observed that the President, when vacancies happen during the recess of the Senate, may fill them till it meets.").

*Lawfulness of Recess Appointments During a Recess of the Senate*
*Notwithstanding Periodic Pro Forma Sessions*

Nineteenth-century sources reflect this understanding. Justice Story framed the issue in terms of the Senate's ability to review nominations: "There was but one of two courses to be adopted [at the Founding]; either, that the senate should be perpetually in session, in order to provide for the appointment of officers; or, that the president should be authorized to make temporary appointments during the recess, which should expire, when the senate should have had an opportunity to act on the subject." 3 Joseph Story, *Commentaries on the Constitution of the United States* § 1551, at 410 (1833); *id.* § 1552, at 411 (discussing renomination when "the senate is assembled"). And as early as the Monroe Administration, the Executive Branch's analysis of the Clause had begun to focus on the availability of the Senate to be consulted on nominations. *See, e.g., Executive Authority to Fill Vacancies*, 1 Op. Att'y Gen. 631, 633 (1823) ("[A]ll vacancies which . . . happen to exist at a time when *the Senate cannot be consulted as to filling them,* may be temporarily filled by the President . . . .") (emphasis added); *Power of President to Fill Vacancies*, 3 Op. Att'y Gen. 673, 676 (1841) ("[T]he convention very wisely provided against the possibility of such evils [i.e., "interregna in the executive powers"] by enabling and requiring the President to keep full every office of the government during a recess of the Senate, *when his advisers could not be consulted . . . .*") (emphasis added); *Power of President to Appoint to Office during Recess of Senate*, 4 Op. Att'y Gen. 523, 526 (1846) ("[T]he vacancy happened at a time, and continues now to exist, *when the President cannot obtain the advice and consent of his constitutional advisers. . . .* [T]his vacancy happening from the inaction of the Senate on the nomination made[] is within the meaning of the [Recess Appointments Clause], and may be filled by an Executive Appointment." (emphasis added)).

Opinions of the Attorney General have construed the Clause in order to fulfill its purpose that there be an uninterrupted power to fill federal offices. Thus, Attorney General Wirt advised in 1823 that "whensoever a vacancy shall exist which the public interests require to be immediately filled, and in filling which, the advice and consent of the Senate cannot be immediately asked, because of their recess, the President shall have the power of filling it by an appointment" because "[t]he substantial purpose of the constitution was to keep these offices filled; and powers adequate to this purpose were intended to be conveyed." *Executive Authority to Fill Vacancies*, 1 Op. Att'y Gen. at 632; *see also Power of President to Fill Vacancies*, 3 Op. Att'y Gen. at 675 (affirming the President's power to make a second recess appointment after the Senate failed to act on a nomination during the term of the first appointment because "the President, charged with the high duty of giving full effect to the law, must have a power like its own existence—perpetual"); *President's Power to Fill Vacancies in Recess of the Senate*, 12 Op. Att'y Gen. 32, 38 (1866) (same, because "as to the executive power, it is always to be in action, or in capacity for action; and . . . to meet this necessity, there is a provision . . . against vacancies in all the subordinate offices, and that at all times there is a power to fill such vacancies").[16]

---

[16] Indeed, in construing the phrase "happen during the Recess" in the Recess Appointments Clause to mean "happen to exist" rather than originate in the recess, Attorney General Wirt identified two possibilities: one was "most accordant with the letter of the constitution; the second, most accordant with its reason and spirit." *Executive Authority to Fill Vacancies*, 1 Op. Att'y Gen. at 632. He chose the "construction of the constitution which is compatible with its spirit, reason, and purpose." *Id.* at 633. The courts have subsequently endorsed the construction adopted by Wirt. *See, e.g., Evans*, 387 F.3d at 1226-27; *United States v. Woodley*, 751 F.2d 1008, 1012-13 (9th Cir. 1985) (en banc); *United States v. Allocco*, 305 F.2d 704, 710-14 (2d Cir. 1962); *In re Farrow*, 3 F. 112, 115-16 (N.D. Ga. 1880). *But see Schenck v. Peay*, 21 F. Cas. 672, 674-75 (E.D. Ark. 1869) (finding recess appointment

11

Subsequent Attorneys General and, later, this Office have continued to place central importance on the Senate's availability to give advice and consent. In his seminal opinion concluding that a significant intrasession adjournment is a "recess" in which recess appointments can be made, Attorney General Daugherty focused on this point: "Regardless of whether the Senate has adjourned or recessed, the real question . . . is whether *in a practical* sense the Senate is in session so that *its advice and consent can be obtained*." Daugherty Opinion, 33 Op. Att'y Gen. at 21-22 (second emphasis added); *see also id.* at 25 ("Is the Senate absent so that it can not receive communications from the President or participate as a body in making appointments?"). Thus, in determining whether an intrasession adjournment constitutes a recess in the constitutional sense, the touchstone is "its *practical effect*: *viz.*, whether or not the Senate is *capable of exercising its constitutional function* of advising and consenting to executive nominations." *Recess Appointments*, 41 Op. Att'y Gen. at 467 (emphasis added); *accord Intrasession Recess Appointments*, 13 Op. O.L.C. at 272. That understanding has been embraced by some prominent commentators as well. *See* Louis Fisher, *Constitutional Conflicts between Congress and the President* 38 (5th ed. 2007) ("A temporary recess of the Senate, 'protracted enough to prevent that body from performing its functions of advising and consenting to executive nominations,' permits the President to make recess appointments.") (quoting *Recess Appointments*, 41 Op. Att'y Gen. at 466).

Significantly, a century ago, the Senate Judiciary Committee adopted a functional understanding of the term "recess" that focuses on the Senate's ability to conduct business. In rejecting the theory that President Theodore Roosevelt could make recess appointments during a brief "constructive recess" between two sessions of Congress, the Committee wrote of the Recess Appointments Clause:

> It was evidently intended by the framers of the Constitution that [the word "recess"] should mean something real, not something imaginary; something actual, not something fictitious. They used the word as the mass of mankind then understood it and now understand it. It means, in our judgment, . . . the period of time when the Senate is *not sitting in regular or extraordinary session as a branch of the Congress, or in extraordinary session for the discharge of executive functions*; when its members owe no duty of attendance; when its Chamber is empty; when, because of its absence, it can not receive communications from the President *or participate as a body in making appointments*. . . . Its sole purpose was to render it certain that at all times there should be, whether the Senate was in session or not, an officer for every office, entitled to discharge the duties thereof.

S. Rep. No. 58-4389, at 2 (1905) (second emphasis added); *see also* Daugherty Opinion, 33 Op. Att'y Gen. at 24 (noting that this report was "most significant of all" authorities in supporting the conclusion that a substantial intrasession adjournment was a constitutional "recess"). The Senate continues to cite that report as an authoritative source "on what constitutes a 'Recess of the Senate.'" *See Riddick's Senate Procedure* 947 & n.46 (1992) (citing report), *available at* http://www.gpo.gov/fdsys/pkg/GPO-RIDDICK-1992/pdf/GPO-RIDDICK-1992-88.pdf.

---

unlawful where the vacancy "existed, but did not happen, during the recess of the senate"); *In re District Attorney of United States*, 7 F. Cas. 731, 734-38 (E.D. Pa. 1868) (casting doubt on such an appointment).

*Lawfulness of Recess Appointments During a Recess of the Senate
Notwithstanding Periodic Pro Forma Sessions*

The Comptroller General attributed a similar understanding to the entire Congress when he opined that the "primary purpose" of the Pay Act was

> to relieve "recess appointees" of the burden of serving without compensation during periods when the Senate *is not actually sitting and is not available to give its advice and consent in respect to the appointment*, irrespective of whether the recess of the Senate is attributable to a final adjournment *sine die* or to an adjournment to a specified date.

*Appointments—Recess Appointments*, 28 Comp. Gen. at 37 (emphasis added).

**2.**

Guided by these principles, we conclude that the President may determine that pro forma sessions at which no business is to be conducted do not interrupt a Senate recess for purposes of the Recess Appointments Clause. Our conclusion rests on three considerations.

First, both the Framers' original understanding of the Recess Appointments Clause and the longstanding views of the Executive and Legislative Branches support the conclusion that the President may make recess appointments when he determines that, as a practical matter, the Senate is not available to give advice and consent to executive nominations. The Recess Appointments Clause was adopted to allow the President to fill offices when the Senate was not "in session for the appointment of officers." *The Federalist No. 67*, at 410 (Alexander Hamilton). And, from the early days of the Republic, the Executive has taken the position that "all vacancies which . . . happen to exist at a time when the Senate cannot be consulted as to filling them, may be temporarily filled by the President." *Executive Authority to Fill Vacancies*, 1 Op. Att'y Gen. at 633. Likewise, in 1905, the Senate Judiciary Committee defined "recess" as used in the Clause to be the period of time when the Senate cannot "participate as a body in making appointments." S. Rep. No. 58-4389, at 2.

We do not believe that the convening of periodic pro forma sessions precludes the President from determining that the Senate is unavailable during an intrasession recess otherwise long enough to support the President's recess appointment authority. During the last three Congresses, such sessions ordinarily have lasted only a few seconds. *See, e.g.*, 157 Cong. Rec. D1404 (daily ed. Dec. 30, 2011) (noting that day's pro forma session lasted from 11:00:02 until 11:00:34 a.m.); *see also supra* n. 2. Records of the sessions typically do not disclose the presence of any Senator other than the single convening member. *See, e.g.*, 157 Cong. Rec. S8793 (daily ed. Dec. 30, 2011) (reflecting the presence of only Senator Reed). And importantly, the pertinent Senate order states in advance that there is to be "no business conducted" during the ensuing sessions. *See, e.g.*, 157 Cong. Rec. S8783 (daily ed. Dec. 17, 2011); *see also supra* p. 2.[17]  The purpose of these sessions avowedly is not to conduct business;

---

[17]  The Senate's rules would also prevent it from acting on nominations or transacting other legislative business during such sessions if, as expected, only a few Senators are present. Under those rules, a quorum consists of "a majority of the Senators duly chosen and sworn." Senate Rule VI(1), Senate Standing Rules at 5. Whenever it is determined that "a quorum is not present, a majority of the Senators present may direct the Sergeant at Arms to request, and, when necessary, to compel the attendance of the absent Senators, which order shall be determined

instead, either the Senate has intended to prevent the President from making recess appointments during its absence or the House has intended to require the Senate to remain in session (toward the same end). *See supra* pp. 2–3; *see also* Henry B. Hogue, Cong. Research Serv., RS21308, *Recess Appointments: Frequently Asked Questions* 3 (rev. Mar. 2008) (noting use of such sessions "for the stated purpose of preventing [recess] appointments").

Under these circumstances, the President could properly consider the pertinent intrasession recess period to be one during which the Senate is not genuinely "capable of exercising its constitutional function of advising and consenting to executive nominations," *Recess Appointments*, 41 Op. Att'y Gen. at 467; *see* Dellinger Opinion, 20 Op. O.L.C. at 161 (noting the President's "discretion to make a good-faith determination of whether a given recess is adequate to bring the Clause into play"); Daugherty Opinion, 33 Op. Att'y Gen. at 25 (discussing the President's "large, although not unlimited, discretion to determine when there is a real and genuine recess making it impossible for him to receive the advice and consent of the Senate"). Indeed, as noted above, presidential messages delivered to the Senate during previous recesses were not laid before that body and entered into the Congressional Record until after the recess was over, notwithstanding the convening of pro forma sessions before that date. *See supra* pp. 3–4 & n. 5. And the Senate has made special arrangements for the appointment of its own officers during the recess, in apparent recognition of the fact that it will not be in session for the purpose of making appointments under its usual procedures. *See supra* p. 3 & n. 4. "[T]he rationale for treating substantial intrasession adjournments as 'recesses' for purposes of the Recess Appointments Clause is that substantial adjournments prevent the Senate from acting on nominations." *Intrasession Recess Appointments*, 13 Op. O.L.C. at 273. By the same reasoning, brief pro forma sessions of this sort, at which the Senate is not capable of acting on nominations, may be properly viewed as insufficient to terminate an ongoing recess for purposes of the Clause.[18]

This view of the effect of pro forma sessions on the President's recess appointment power finds additional support in one of this Office's prior opinions, *Recess Appointments During an Intrasession Recess*, 16 Op. O.L.C. 15. That opinion addressed the propriety of making recess appointments during a recess that began on January 3, 1992, and ended on January 21, 1992. We noted that, aside from a "brief formal session on January 3" at which the body conducted no

---

without debate; and pending its execution, and until a quorum shall be present, no debate nor motion, except to adjourn, or to recess pursuant to a previous order entered by unanimous consent, shall be in order." Senate Rule VI(4), *id.* at 5–6; *see also Riddick's Senate Procedure* 1046 ("No debate nor business can be transacted in the absence of a quorum . . . ."). We recognize that, as a practical matter, neither the scheduling order nor the quorum requirement will always prevent the Senate from acting without a quorum through unanimous consent. Indeed, the Senate has occasionally enacted legislation by unanimous consent during pro forma sessions. *See infra* p. 21. But as more fully explained below, we do not believe that this sporadic practice requires the President to consider the Senate available to perform its constitutional functions when it is in recess and, particularly, when it has provided by order that no business will be conducted.

[18]  In reaching this conclusion, we need not look behind the actual terms of the Senate's orders. The Senate itself labels the sessions "pro forma" and specifies that there is to be "no business conducted" during those sessions. *See, e.g.*, 157 Cong. Rec. S8783 (daily ed. Dec. 17, 2011). These orders make clear that the Senate cannot perform its advise-and-consent role during the pro forma sessions. The issue we have been asked to address relates to the legal effect of such sessions on the intrasession recess, and the Senate orders on their face warrant the conclusion that the Senate is unavailable to provide advice and consent during the intrasession recess.

*Lawfulness of Recess Appointments During a Recess of the Senate
Notwithstanding Periodic Pro Forma Sessions*

business (and which evidently was held to address the terms of the Twentieth Amendment, *see infra* n. 22), the Senate had been in recess since November 27, 1991. 16 Op. O.L.C. at 15 n.1. Thus, we observed that "[f]or practical purposes with respect to nominations, this recess closely resembles one of substantially greater length." *Id.* To be sure, this Office there stated only that two recesses broken solely by a pro forma session "closely resemble[]" a single recess of greater length, not that they were constitutionally indistinguishable from one. Nevertheless, we thought the *effective length* of the recess relevant in determining whether the President could make a recess appointment. The same consideration applies here. A lengthy intrasession recess broken only by pro forma sessions closely resembles an unbroken recess of the same length; thus, "[e]xcept for its brief formal session[s] . . . the Senate will have been absent from [January 3, 2012] until [January 23, 2012], a period of [twenty] days." *Id.* And in determining whether such a recess triggers the President's appointment authority under the Recess Appointments Clause, we believe the critical inquiry is the "practical" one identified above—to wit, whether the Senate is available to perform its advise-and-consent function. For practical purposes, the President may properly view the Senate as unavailable for twenty days.

Second, allowing the Senate to prevent the President from exercising his authority under the Recess Appointments Clause by holding pro forma sessions would be inconsistent with both the purpose of the Clause and historical practice in analogous situations. As explained above, the Recess Appointments Clause has long been understood as intended to provide a method of appointment when the Senate was unavailable to provide advice and consent, so that offices would not remain vacant to the detriment of the public interest. If the Senate can avoid a "Recess of the Senate" under the Clause by having a single Member "gavel in" before an empty chamber, then the Senate can preclude the President from making recess appointments even when, as a practical matter, it is unavailable to fulfill its constitutional role in the appointment process for a significant period of time. The purpose of the Clause is better served by a construction that permits the President to make recess appointments when the Senate is unavailable to advise and consent for lengthy periods. *See Power of President to Fill Vacancies*, 2 Op. Att'y Gen. 525, 526-27 (1832) ("[A] construction that defeats the very object of the grant of power cannot be the true one. It was the intention of the constitution that the offices created by law, and necessary to carry on the operations of the government, should always be full, or, at all events, that the vacancy should not be a protracted one."); *cf. Wright v. United States*, 302 U.S. 583, 596 (1938) ("We should not adopt a construction [of the Veto Clauses] which would frustrate either of the[ir] purposes.").

Further, Presidents have routinely exercised their constitutional authority to make recess appointments between sessions of Congress since President Washington made such appointments in the earliest days of the Republic. Although we have focused in this opinion on the twenty-day intrasession recess at the beginning of the second session, the Senate in fact adjourned pursuant to an order that provided that there would also be "no business conducted" for the final seventeen days of the first session. This period of time, a total of thirty-seven days, in substance closely resembles a lengthy intersession recess. *See Recess Appointments During an Intrasession Recess*, 16 Op. O.L.C. at 15 n.1. Thus, an understanding of the Recess Appointments Clause that permits the President to make appointments during this recess also would be consistent with historical practice.

*Opinions of the Office of Legal Counsel in Volume 36*

Third, permitting the Senate to prevent the President from making recess appointments through pro forma sessions would raise constitutional separation of powers concerns. To preserve the constitutional balance of powers, the Supreme Court has held that congressional action is invalid if it "'undermine[s]' the powers of the Executive Branch, or 'disrupts the proper balance between the coordinate branches [by] prevent[ing] the Executive Branch from accomplishing its constitutionally assigned functions." *Morrison v. Olson*, 487 U.S. 654, 695 (1988) (quoting *Commodity Futures Trading Comm'n v. Schor*, 478 U.S. 833, 856 (1986); *Nixon v. Adm'r of Gen. Servs.*, 433 U.S. 425, 443 (1977) (alterations in *Morrison*)); *accord Loving v. United States,* 517 U.S. 748, 757 (1996) ("[I]t remains a basic principle of our constitutional scheme that one branch of the Government may not intrude upon the central prerogatives of another. Even when a branch does not arrogate power to itself . . . the separation-of-powers doctrine requires that a branch not impair another in the performance of its constitutional duties." (citations omitted)).

The Constitution expressly confers upon the President the power to make recess appointments when the Senate is unable to give its advice and consent because it is in recess. It is the established view of the Executive Branch that

> Congress may not derogate from *the President's* constitutional authority to fill up vacancies during recesses, by granting less power to a recess appointee than a Senate-confirmed occupant of the office would exercise: "Provisions purporting to grant authority only to individuals confirmed by the Senate interfere with the President's recess appointment power, and are unconstitutional."

Memorandum for J. Paul Oetken, Associate Counsel to the President, from Randolph D. Moss, Assistant Attorney General, Office of Legal Counsel, *Re: Displacement of Recess Appointees in Tenure-Protected Positions* at 6 (Sept. 1, 2000) (quoting Statement Upon Signing H.R. 5678, 2 Pub. Papers of George H.W. Bush 1767, 1768 (Oct. 6, 1992)); *see also* Memorandum for Walter Dellinger, Assistant Attorney General, Office of Legal Counsel, from Richard Shiffrin, Deputy Assistant Attorney General, Office of Legal Counsel, *Re: Foreign Claims Settlement Commission* at 6 (Nov. 12, 1993) (the principle that "recess appointees have the powers and rights of Senate-confirmed appointees" is "a constitutional principle of great importance").[19] In such circumstances, however, the President can still make recess appointments. Senate action that would completely prevent the President from making recess appointments in situations where the Senate is as a practical matter unavailable would do even more to "disrup[t] the proper balance between the coordinate branches," *Morrison*, 487 U.S. at 695, and "intrud[e] upon" the President's constitutional prerogatives, *Loving*, 517 U.S. at 757; *cf.* Daugherty Opinion, 33 Op. Att'y Gen. at 23 ("If the President's power of appointment is to be defeated because the Senate takes an adjournment to a specified date, the painful and inevitable result will be measurably to

---

[19] These concerns also have been enunciated in other presidential signing statements. *See* Statement on Signing the Energy Policy Act of 1992, 2 Pub. Papers of George H.W. Bush 1962, 1963 (Oct. 24, 1992) (stating that a provision that "authorizes a Transition Manager to exercise the powers of the Corporation until a quorum of the Board of Directors has been 'appointed and confirmed,' must be interpreted so as not to interfere with my authority under Article II, section 2 of the Constitution to make recess appointments to the Board"); Statement on Signing the Departments of Commerce, Justice, and State, the Judiciary, and Related Agencies Appropriations Act, 1985, 2 Pub. Papers of Ronald Reagan 1210, 1211 (Aug. 30, 1984) (explaining that a bill intended to restrict powers of recess appointees would raise "troubling constitutional issues").

prevent the exercise of governmental functions.  I can not bring myself to believe that the framers of the Constitution ever intended such a catastrophe to happen.").[20]

There is also some judicial authority recognizing the need to protect the President's recess appointment authority from congressional incursion.  *See McCalpin v. Dana*, No. 82-542, at 14 (D.D.C. Oct. 5, 1982) ("The system of checks and balances crafted by the Framers . . . strongly supports the retention of the President's power to make recess appointments."), *vacated as moot*, 766 F.2d 535 (D.C. Cir. 1985); *id.* at 14 (explaining that the "President's recess appointment power" and "the Senate's power to subject nominees to the confirmation process" are both "important tool[s]" and "the presence of both powers in the Constitution demonstrates that the Framers . . . concluded that these powers should co-exist"); *Staebler v. Carter*, 464 F. Supp. 585, 597 (D.D.C. 1979) ("it is . . . not appropriate to assume that this Clause has a species of subordinate standing in the constitutional scheme"); *id.* at 598 ("It follows that a construction of [a statute] which would preclude the President from making a recess appointment in this situation—*i.e.*, during a Senate recess and after the statutory term of the incumbent [official] has expired—would seriously impair his constitutional authority and should be avoided [if it] is possible to do so."); *see also Swan v. Clinton*, 100 F.3d 973, 987 (D.C. Cir. 1996) (rejecting an argument that "rests on the assumption that a recess appointment is somehow a constitutionally inferior procedure").  *But see Wilkinson v. Legal Servs. Corp.*, 865 F. Supp. 891, 900 (D.D.C. 1994) (concluding, contrary to *McCalpin* and *Staebler*, that a holdover provision could preclude a recess appointment), *rev'd on other grounds*, 80 F.3d 535 (D.C. Cir. 1996); *Mackie v. Clinton*, 827 F. Supp. 56, 57-58 (D.D.C. 1993) (same), *vacated as moot*, Nos. 93-5287, 93-5289, 1994 WL 163761 (D.C. Cir. Mar. 9, 1994).

We recognize that the Senate may choose to remain continuously in session and available to exercise its advise-and-consent function and thereby prevent the President from making recess appointments.  But, under the legal authority set forth above, the President may properly determine that the Senate is not available under the Recess Appointments Clause when, while in recess, it holds pro forma sessions where no business can be conducted.  Such sessions do not

---

[20]  This Office occasionally has raised similar concerns about the constitutionality of the Pay Act, 5 U.S.C. § 5503 (2006), which imposes certain restrictions on the payment of recess appointees.  *See* Memorandum for the Attorney General, from John O. McGinnis, Deputy Assistant Attorney General, Office of Legal Counsel, *Recess Appointments* at 7 n.7 (July 7, 1988) ("Because it places limitations on the President's exercise of his constitutional authority, 5 U.S.C. § 5503 may be unconstitutional."); *Intrasession Recess Appointments*, 13 Op. O.L.C. at 276 n.6 ("If the [Pay Act] were to preclude the President from paying a recess appointee in these circumstances, it would raise serious constitutional problems because of the significant burden that an inability to compensate an appointee would place on the textually committed power of the President to make recess appointments.").  The Senate's use of pro forma sessions to prevent the President from making recess appointments, if valid, would constitute a greater restriction on recess appointment authority than the terms of the Pay Act.  The latter allows payment of recess appointees under a number of circumstances and permits retroactive payment after a person serving under a recess appointment has been confirmed.  *Foreign Claims Settlement Commission* at 9; Memorandum for Nicholas deB. Katzenbach, Assistant Attorney General, Office of Legal Counsel, from Herman Marcuse, Attorney-Adviser, Office of Legal Counsel, *Re: Constitutionality of 5 U.S.C. 56 (Recess Appointments)* at 1 (Sept. 27, 1961).  In contrast, the Senate's use of pro forma sessions, if it had the effect of shortening recesses to a period insufficient to constitute a "recess" under the Recess Appointments Clause, would prevent the President from making recess appointments in the circumstances presented, even if the person to be appointed would serve without compensation.

have the legal effect of interrupting a Senate recess for purposes of the Recess Appointments Clause.

### 3.

We have considered several counterarguments to our analysis. In our judgment, these points, while not insubstantial, do not overcome the conclusion presented above.

First, we considered that the Senate has employed pro forma sessions in other contexts and that, in those contexts, a pro forma session may have the same legal effect as any other session and thus may fulfill certain constitutional requirements. For example, pro forma sessions are most commonly used to address the requirement that "[n]either House, during the Session of Congress, shall, without the Consent of the other, adjourn for more than three days." U.S. Const. art. I, § 5, cl. 4; *see* U.S. Senate Glossary, *available at* http://www.senate.gov/reference/ glossary_term/pro_forma_session.htm (defining "pro forma session" as a "brief meeting (sometimes only several seconds) of the Senate in which no business is conducted. It is held usually to satisfy the constitutional obligation that neither chamber can adjourn for more than three days without the consent of the other.").[21] In addition, in 1980, and sporadically thereafter, pro forma sessions have been used to address the Twentieth Amendment's direction that, in the absence of legislation providing otherwise, Congress must convene on January 3.[22] Pro forma sessions have also been employed for parliamentary purposes, e.g., to permit a cloture vote to ripen, or to hear an address.[23]

---

[21] *Riddick's Senate Procedure* identifies several examples in which "the Senate pursuant to a previous order has met for very brief periods and recessed over until a subsequent date, not in excess of 3 days," the earliest of which occurred in 1949. *Riddick's Senate Procedure* 251 & nn.1-3.

[22] U.S. Const. amend. XX, § 2 ("Congress shall assemble at least once in every year, and such meeting shall begin at noon on the 3d day of January, unless they shall by law appoint a different day."). Congress routinely enacts legislation when it wishes to vary the date of its first meeting. *See, e.g.,* Pub. L. No. 111-289 (2010); Pub. L. No. 105-350 (1998); Pub. L. No. 99-613 (1986); Pub. L. No. 94-494 (1978); Pub. L. No. 89-340 (1965); Pub. L. No. 83-199 (1953); Pub. L. No. 79-289 (1945). Occasionally, however, Congress (or an individual House) uses a pro forma session to comply with the Twentieth Amendment's default date. The first such use of a pro forma session that we are aware of occurred in 1980. *See* H.R. Con. Res. 232, 96th Cong., 93 Stat. 1438 (1979) ("[W]hen the Congress convenes on January 3, 1980, . . . neither the House nor the Senate shall conduct organizational or legislative business until Tuesday, January 22, 1980, [unless convened sooner by House and Senate leaders]."). Thereafter, it appears to have remained rare until the last decade. *See* H.R. Con. Res. 260, 102d Cong., 105 Stat. 2446 (1991) (providing that neither House shall "conduct organizational or legislative business" on January 3, 1992); 151 Cong. Rec. S14,421 (daily ed. Dec. 21, 2005) (Senate order providing for "a pro forma session only" on January 3, 2006"); 153 Cong. Rec. S16,069 (daily ed. Dec. 19, 2007) (same for January 3, 2008); 157 Cong. Rec. S8783 (daily ed. Dec. 17, 2011) (same for January 3, 3012). On at least one occasion, Congress has changed the date of the first meeting of a session by law and both Houses held pro forma sessions to comply with that law. *See* Pub. L. No. 111-121, 123 Stat. 3479 (2009) (providing that the second session of the 111th Congress begin on January 5, 2010); 155 Cong. Rec. S14,140 (daily ed. Dec. 24, 2009) (Senate order providing for "a pro forma session only" on January 5, 2010); 156 Cong. Rec. H2-H8 (daily ed. Jan. 5, 2010) ("[N]o organizational or legislative business will be conducted on this day.").

[23] *See* 133 Cong. Rec. 15,445 (1987) ("The Senate will go over until Monday pro forma, no business, no speeches, just in and out, and the pro forma meeting on Monday would qualify the cloture motion to be voted on Tuesday . . . ."); 139 Cong. Rec. 3039, 3039 (1993) ("Any sessions will be pro forma or solely for the purpose of hearing the Presidents' Day address on Wednesday morning.").

*Lawfulness of Recess Appointments During a Recess of the Senate*
*Notwithstanding Periodic Pro Forma Sessions*

Those precedents provide only weak support for the claim that a series of consecutive pro forma sessions may be used to block recess appointments in the circumstances presented here. There is no evidence of a tradition of using pro forma sessions to prevent a "recess" within the meaning of the Recess Appointments Clause. That attempt began in 2007 with the 110th Congress.[24] There may be at least a limited tradition of a House of Congress using consecutive pro forma sessions to avoid adjournments of more than three days without obtaining the other House's consent.[25] But past uses of pro forma sessions for housekeeping purposes are not good analogies for the current use of pro forma sessions to block appointments under the Recess Appointments Clause. The former uses affect the operations of only the House in question, and the Constitution provides that "[e]ach House may determine the Rules of its Proceedings," U.S. Const. art. I, § 5, cl. 2. Even uses in connection with interchamber relations affect the Legislative Branch *alone*. The question whether the use of pro forma sessions for those purposes is consistent with the Constitution is not presented here. Assuming that such uses are constitutional, however, it does not follow that pro forma sessions may be used to prevent the President from exercising his constitutional authority to make recess appointments when he determines that the Senate is unavailable to provide advice and consent.[26] Put differently, whether the House has consented to the Senate's adjournment of more than three days does not

_____

[24] It does appear, though, that the use of pro forma sessions to prevent recess appointments was at least contemplated as early as the 1980s. *See* 145 Cong. Rec. 29,915 (1999) (statement of Sen. Inhofe) ("[Senator Byrd] extracted from [the President] a commitment in writing that he would not make recess appointments and, if it should become necessary because of extraordinary circumstances to make recess appointments, that he would give the list to the majority leader . . . in sufficient time in advance that they could prepare for it either by agreeing in advance to the confirmation of that appointment or by not going into recess and staying in pro forma so the recess appointments could not take place.").

[25] For example, in 1929, a concurrent resolution provided that the House return from summer recess on September 23, 71 Cong. Rec. 3045 (June 18, 1929). The House passed a separate resolution providing that "after September 23, 1929, the House shall meet only on Mondays and Thursdays of each week until October 14, 1929," provided that the Speaker could call them back sooner if "legislative expediency shall warrant it," *id.* at 3228 (June 19, 1929). Although it was not so stated in the text of the resolution, it was "agreed that there shall be nothing transacted [during the Monday and Thursday sessions] except to convene and adjourn; no business whatever." *Id.* at 3229 (statement of Rep. Tilson); *see also* 8 C. Cannon, *Precedents of the House of Representatives* § 3369, at 820 (1935) (describing this incident as one in which the House "provid[ed] for merely formal sessions"). This arrangement was subsequently extended twice. 71 Cong. Rec. 4531-32 (Oct. 14, 1929) (H.R. Res. 59, described by Rep. Tilson as "the same resolution, the dates being changed, as the original recess resolution passed by the House last June); *id.* at 5422 (Nov. 11, 1929). Subsequent examples from the Senate involve more formal agreements to the pro forma nature of the sessions. *See, e.g.*, 96 Cong. Rec. 16,980 (Dec. 22, 1950) (setting schedule of two consecutive pro forma sessions); *id.* at 17,020 (Dec. 26, 1950); *id.* at 17,022 (Dec. 29, 1950); 126 Cong. Rec. 2574 (Feb. 8, 1980) (setting schedule of two consecutive pro forma sessions); *id.* at 2614 (Feb. 11, 1980); *id.* at 2853 (Feb. 14, 1980); 127 Cong. Rec. 190 (Jan. 6, 1981) (setting schedule of three consecutive pro forma sessions); *id.* at 238 (Jan. 8, 1981); *id.* at 263 (Jan. 12, 1981); *id.* at 276 (Jan. 15, 1981).

[26] *Cf.* Letter for Peter W. Rodino, Jr., Chairman, Committee on the Judiciary, U.S. House of Representatives, from Robert G. Dixon, Assistant Attorney General, Office of Legal Counsel at 4-5 (Dec. 4, 1973) ("Under Section 2 of H.R. 7386, Congress could prevent the exercise of a pocket veto, except at the close of a Congress, when one or both Houses adjourned for several months, by adjourning either to a date certain or pro forma to a date close to the beginning of the next working session. . . . To the extent that H.R. 7386 unconstitutionally permits Congress to keep a bill in suspended animation for lengthy periods during adjournments other than sine die, it unconstitutionally narrows the President's pocket veto authority.").

determine the Senate's practical availability during a period of pro forma sessions and thus does not determine the existence of a "Recess" under the Recess Appointments Clause.

Second, it might be argued that, in light of the Senate's power to "determine the Rules of its Proceedings," U.S. Const. art. I, § 5, cl. 2, the Executive Branch would be bound by the Chamber's own understanding of whether the pro forma sessions have the legal effect of interrupting a "Recess of the Senate" for the purposes of the Recess Appointments Clause. The Rules of Proceedings Clause has been understood to grant the Houses of Congress broad discretion in managing their internal affairs. *See, e.g., United States v. Ballin*, 144 U.S. 1, 5 (1892) ("[A]ll matters of method [of proceeding] are open to the determination of the house, and it is no impeachment of the rule to say that some other way would be better, more accurate or even more just."). That Clause might also be understood to permit them conclusively to determine when they are in session and when they are in recess. *See, e.g.*, Michael Herz, *Abandoning Recess Appointments?: A Comment on Hartnett (and Others)*, 26 Cardozo L. Rev. 443, 459 (2005) ("I would think that pursuant to the authority of each House to make rules for its own proceedings Congress could decide to hold twelve 'sessions' each calendar year, with a few days off—perhaps just a weekend—between them."); *cf.* Arthur S. Miller, *Congressional Power to Define the Presidential Pocket Veto Power*, 25 Vand. L. Rev. 557, 567 (1972) ("Surely the determination of what constitutes adjournment is a 'proceeding' within the terms of that section [the Rules of Proceeding Clause].").

The Supreme Court, however, has made clear that Congress's power under this provision is not unlimited, and specifically that Congress "may not by its rules ignore constitutional restraints or violate fundamental rights." *Ballin*, 144 U.S. at 5. Thus, the validity and application of congressional rules are subject to review in court when the rules affect interests outside of the Legislative Branch. *See, e.g., United States v. Smith*, 286 U.S. 6, 33 (1932) ("As the construction to be given the rules affects persons other than members of the Senate, the question presented is of necessity a judicial one."); *Ballin*, 144 U.S. at 5 ("[T]here should be a reasonable relation between the mode or method of proceeding established by the rule and the result which is sought to be attained."); *Vander Jagt v. O'Neill*, 699 F.2d 1166, 1173 (D.C. Cir. 1983) ("Article I does not alter our judicial responsibility to say what rules Congress may not adopt because of constitutional infirmity."). A Senate rule that pro forma sessions interrupt a "Recess of the Senate" (or that otherwise seeks to prevent the President from exercising authority under the Recess Appointments Clause) would affect other persons—the President and potential appointees at the least. It would also disrupt the Constitution's balancing of executive and legislative authority in the appointments process. To be sure, as explained above, the President's authority to make recess appointments is constrained when the Senate is continuously in session and available to perform its advise-and-consent function. But the Senate could not by rule unilaterally prevent the President from exercising his authority to make temporary appointments under the Clause by declaring itself in session when, in practice, it is not available to provide advice and consent, any more than the President could make a recess appointment when the Senate was in practice available to do so. *See* Daugherty Opinion, 33 Op. Att'y Gen. at 25

*Lawfulness of Recess Appointments During a Recess of the Senate*
*Notwithstanding Periodic Pro Forma Sessions*

(recognizing that a "palpable abuse" of the President's "discretion to determine when there is a real and genuine recess" of the Senate might subject his appointment to review").[27]

Third, it could be argued that the experience of recent pro forma sessions suggests that the Senate is in fact available to fulfill its constitutional duties during recesses punctuated by periodic pro forma sessions. Twice in 2011, the Senate passed legislation during pro forma sessions by unanimous consent, evidenced by the lack of objection from any member who might have been present at the time. 157 Cong. Rec. S8789 (daily ed. Dec. 23, 2011); *id.* at S5297 (daily ed. Aug. 5, 2011). During one of these sessions, the Senate also agreed to a conference with the House, and messages received from the House earlier in the intrasession recess were put into the Congressional Record. 157 Cong. Rec. S8789-90 (daily ed. Dec. 23, 2011). Conceivably, the Senate might provide advice and consent on pending nominations during a pro forma session in the same manner.

We do not believe, however, that these examples prevent the President from determining that the Senate remains unavailable to provide advice and consent during the present intrasession recess. The scheduling order under which the pro forma sessions are held during this recess expressly provides that there is to be "no business conducted." 157 Cong. Rec. S8783 (daily ed. Dec. 17, 2001). In our judgment, the President may properly rely on the public pronouncements of the Senate that it will not conduct business (including action on nominations), in determining whether the Senate remains in recess, regardless of whether the Senate has disregarded its own orders on prior occasions. Moreover, even absent a Senate pronouncement that it will not conduct business, there may be circumstances in which the President could properly conclude that the body is not available to provide advice and consent for a sufficient period to support the use of his recess appointment power. It is common for resolutions of adjournment authorizing extended intrasession recesses to provide that the Senate "stand[s] recessed or adjourned until [a specified date], . . . or until the time of any reassembly" ordered by the leaders of the two Houses "as they may designate whenever, in their opinion, the public interest shall warrant it." *See, e.g.*, H.R. Con. Res. 361, 108th Cong. (2004). That potential for reassembly by itself does not deprive an extended Senate absence of its character as a recess. In fact, the Senate had adjourned pursuant to such a resolution before the intrasession recess during which Judge Pryor was appointed to the Eleventh Circuit. That recess appointment was approved by this Office, *see* Goldsmith Memorandum, and upheld by the court of appeals en banc, *see Evans v. Stephens*, 387 F.3d 1220.

---

[27] The Senate's scheduling of pro forma sessions to frustrate the President's recess appointment authority does not require us to treat the President's constitutional recess appointment authority as operating at the "lowest ebb" of presidential power under the framework of Justice Jackson's concurring opinion in *Youngstown Sheet & Tube Co. v. Sawyer,* 343 U.S. 579, 637 (1952). The Constitution explicitly grants recess appointment authority to the President, and the Attorney General has long taken the position that, through enactment of the Pay Act, Congress has "acquiesce[d]" to recess appointments under circumstances where that Act would permit payment. *See Recess Appointments,* 41 Op. Att'y Gen. at 466; *see also Appointments—Recess Appointments,* 28 Comp. Gen. at 34, 37 (recognizing the "accepted view" that an extended intrasession adjournment of the Senate is a "recess" in the constitutional sense during which "an appointment properly may be made" and that recipients of such appointments were entitled to pay). Moreover, it is unclear that Justice Jackson's framework would apply in matters involving the balance between the President's constitutional authority to make recess appointments and a single House of Congress's constitutional authority to set its internal rules.