IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

TUAN SAMAHON,

                Plaintiff,

    v.

UNITED STATES DEPARTMENT OF
JUSTICE,

              Defendant.

CIVIL ACTION
NO. 13-6462

## TABLE OF CONTENTS

I.   **INTRODUCTION** ..................................................................................................4

II.  **PROCEDURAL HISTORY** ...............................................................................4

III. **BACKGROUND** .................................................................................................6

    A. Public Disclosure of the Existence of the Goldsmith and Elwood Memoranda ..............8

    B. Samahon Requests the Goldsmith and Elwood Memoranda ...........................................9

IV. **STANDARD OF REVIEW** ...............................................................................11

V.   **FOIA** ...................................................................................................................13

    A. FOIA Overview ...............................................................................................................13

    B. Exemption 5 .....................................................................................................................14

VI. **ANALYSIS** ........................................................................................................16

    A. The DOJ Has Provided an Adequate Factual Basis for the Court to Determine

        Whether the Memoranda Are Protected by a Privilege .................................................16

    B. The Goldsmith and Elwood Memoranda Were Properly Withheld Under

        Exemption 5 ....................................................................................................................17

1. Deliberative process privilege ...................................................................17

   a. Goldsmith Memorandum ...................................................................18

   b. Elwood Memorandum .......................................................................20

2. Attorney-client privilege ..........................................................................21

3. Presidential communications privilege ....................................................24

C.  The Department of Justice Did Not Waive Any Privilege Under Exemption 5

Protecting the Goldsmith and Elwood Memoranda .......................................26

   1. The "adoption or incorporation" exception does not apply to the Goldsmith

   and Elwood Memoranda .............................................................................28

      a. The Seitz Memorandum is a final opinion of the OLC for FOIA purposes.....30

      b. The Obama Administration did not expressly adopt or incorporate the

         reasoning of the Seitz Memorandum .............................................................31

      c. "Temporal proximity" between the recess appointments and the Seitz

         Memorandum is too speculative to infer adoption ........................................33

      d.  The Obama Administration did not adopt the reasoning of the Seitz

         Memorandum through subsequent references to it........................................34

      e.  The references to the Goldsmith and Elwood Memoranda in the Seitz

         Memorandum do not support express adoption of those documents

         by the President..............................................................................................40

   2. The "working law" exception does not apply .....................................44

D.  The Court Will Require an In Camera Inspection of the Elwood Memorandum

In Order to Decide Whether There Are Any Reasonably Segregable Facts...................47

1. Elwood Memorandum ......................................................................................47

2. Goldsmith Memorandum ..............................................................................51

**V.   CONCLUSION** ........................................................................................51

<u>OPINION</u>

**Slomsky, J.**                                                    **February 27, 2015**

## I.    INTRODUCTION

Plaintiff Tuan Samahon brings this action under the Freedom of Information Act

("FOIA") seeking an order to compel the United States Department of Justice to publicly

disclose two unredacted internal government memoranda.  5 U.S.C. § 552.  Both memoranda

sought by Samahon were drafted in the Office of Legal Counsel at the Department of Justice.

One was sent to Counsel to the President of the United States.  The other was not sent but was

maintained in a file at the Office of Legal Counsel.  Both memoranda address the legal limits of

the presidential recess appointment power granted by the United States Constitution.  The

Department of Justice claims that both memoranda are ineligible for full disclosure because

they are subject to FOIA Exemption 5 as privileged agency memoranda.  Plaintiff claims that

the Department of Justice waived its privilege because it cited these memoranda in a third

memorandum which was publicly-disclosed.

## II.    PROCEDURAL HISTORY

The parties in this lawsuit are Plaintiff Tuan Samahon, a law professor, and Defendant

the United States Department of Justice ("DOJ").  On July 15 and November 6, 2013, Samahon

filed FOIA requests with the DOJ Office of Legal Counsel ("OLC"),[1] for two OLC agency

---

[1] According to Special Counsel Paul P. Colborn of the OLC, the OLC serves the following
purpose:

> The principal function of OLC is to assist the Attorney General in his role as
> legal adviser to the President of the United States and to departments and
> agencies of the Executive Branch.  OLC provides advice and prepares opinions
> addressing a wide range of legal questions involving the operations of the
> Executive Branch.  OLC does not purport, and in fact lacks authority to make
> policy decisions.    OLC's legal advice and analysis may inform the

records: first, on July 15, 2013, he sought an unredacted version of a 2004 memorandum from Jack L. Goldsmith III, Assistant Attorney General, Office of Legal Counsel, to Alberto R. Gonzales, Counsel to the President, titled "Re: Recess Appointments in the Current Recess of the Senate" ("Goldsmith Memorandum"); and second, on November 6, 2013, he sought a 2009 "file" memorandum from John P. Elwood, Deputy Assistant Attorney General, Office of Legal Counsel, titled "Re: Lawfulness of Making Recess Appointment During Adjournment of the Senate Notwithstanding 'Pro Forma Sessions'" ("Elwood Memorandum").

In letters dated July 26, 2013 and November 15, 2013, the DOJ denied Samahon's two FOIA requests for the Goldsmith and Elwood Memoranda respectively, claiming that both documents were properly withheld under Exemption 5, which protects privileged inter- and intra-agency documents from disclosure.  5 U.S.C. § 552(b)(5).  Samahon appealed both denials to the DOJ's Office of Information Policy ("OIP"), which affirmed the OLC decisions on September 10, 2013 and January 24, 2014.  (Doc. No. 16 at 4.)

After exhausting his administrative remedies, Samahon instituted the current action in this Court by filing a Complaint (Doc. No. 1) on November 6, 2013 and an Amended Complaint (Doc. No. 16) on February 19, 2014.  The Amended Complaint alleges four separate FOIA violations: in Count One, failure to provide an unredacted version of the Goldsmith Memorandum; in Count Two, failure to provide reasonably segregable portions of the Goldsmith Memorandum; in Count Three, failure to release the Elwood Memorandum; and in Count Four, failure to provide reasonably segregable portions of the Elwood Memorandum.

---

decisionmaking of Executive Branch officials on matters of policy, but OLC's legal advice does not dictate the policy choice to be made.

(Doc. 22-2, Declaration of Paul P. Colborn [hereinafter "Colborn Decl."] ¶ 2.)

(Doc. No. 16 ¶¶ 36-63.)  In the Amended Complaint, Samahon requests an order declaring the nondisclosures unlawful, and seeks injunctive relief and attorney's fees.  (Id. at 12.)

Before the Court are the parties' cross-motions for summary judgment.  In deciding the motions, the Court has considered the following documents: Defendant's Motion for Summary Judgment filed on May 7, 2014 (Doc. No. 22), Plaintiff's Motion for Summary Judgment filed on June 18, 2014 (Doc. No. 24), Defendant's Response in Opposition to Plaintiff's Cross-Motion for Summary Judgment and Reply in Support of its Motion for Summary Judgment filed on July 16, 2014 (Doc. No. 25), and Plaintiff's Reply to Response to Motion for Summary Judgment (Doc. No. 28).

For reasons that follow, Defendant's Motion for Summary Judgment will be granted on Counts One, Two, and Three of the Amended Complaint, and Plaintiff's Motion for Summary Judgment will be denied on those counts.  The Court, however, will reserve judgment on Count Four, pending the results of an in camera inspection of the Elwood Memoranda to determine what, if any, portion of this Memorandum should be disclosed because it may contain facts that are nonexempt and reasonably segregable from exempt material.

## III.    BACKGROUND

Plaintiff Samahon is a tenured professor at Villanova University School of Law, where he researches separation of powers at the federal level.  (Doc. No. 1 at 2.)  According to Samahon, his FOIA requests and this litigation arose out of his research about the scope of the President's recess appointment power.[2]  (Id.)  Under FOIA, he requests disclosure of the

---

[2]    Under Article II, Section 2 of the United States Constitution, the President can make appointments for public office subject to the "advice and consent" of the Senate.  U.S. Const. art. II, § 2, cl. 2.  However, when the Senate is not in session, the President may make "recess appointments" under Article II, Section 2, Clause 3, which allows the President, without Senate approval, to "fill up all Vacancies that may happen during the Recess of the Senate."  U.S. Const. art. II, § 2, cl. 3.

Goldsmith and Elwood Memoranda because he believes the advice contained therein served as a legal foundation for President Barack Obama's January 4, 2012 decision to use his recess appointment power to fill three vacancies on the National Labor Relations Board during skeletal "pro forma" sessions[3] of the Senate. The appointments were made without Senate approval.[4] (Doc. No. 16 at 1, 4.) The recess appointments made during the pro forma sessions were met with public criticism and judicial scrutiny, and ultimately were held unconstitutional by the Supreme Court in National Labor Relations Board v. Noel Canning, 134 S. Ct. 2550 (U.S. 2014).[5]

---

[3] Under Article I, Section 5, Clause 4 of the Constitution, "[n]either House, during the Session of Congress, shall, without the Consent of the other, adjourn for more than three days . . . ." U.S. Const. art. I, § 5, cl. 4. When the House of Representatives does not consent to the adjournment of the Senate, "the Senate has frequently conducted pro forma sessions during recesses occurring within sessions of Congress. These pro forma sessions typically last only a few seconds, and apparently require the presence of only one Senator. Senate orders adopted by unanimous consent provide in advance that there is to be 'no business conducted' at such sessions." (Doc. No. 22-2, Seitz Memorandum ["Seitz Memo."], at 2.) The House of Representatives did not assent to the Senate's 2011-12 winter adjournment. (Doc. No. 16 ¶ 18.) As a result, the Senate held pro forma sessions every three days to meet its constitutional obligation. (Id.)

[4] On January 4, 2012, President Obama appointed Sharon Block, Terrence Flynn, and Richard Griffin to fill vacancies on the National Labor Relations Board ("NLRB"). (Doc. No. 16 ¶ 15.) These appointments were not subject to Senate confirmation, although the Senate was operating pro forma at the time of the appointments. (Id. ¶ 16.) According to Samahon, the Obama Administration contends that these appointments were valid without Senate advice and consent because January 4, 2012 coincided with the Senate's annual winter adjournment, making the appointments proper "recess" appointments. (Id.)

[5] Litigation questioning the legality of these appointments culminated in a January 25, 2013 decision by the U.S. Court of Appeals for the District of Columbia invalidating the appointments on constitutional grounds. See Canning v. NLRB, 705 F.3d 490 (D.C. Cir. 2013), aff'd, 134 S. Ct. 2250 (2014). The government appealed, and the United States Supreme Court also held that recess appointments during the pro forma sessions of the Senate were invalid. NLRB v. Canning, 134 S. Ct. 2250 (2014).

**A.** **Public Disclosure of the Existence of the Goldsmith and Elwood Memoranda**

The Goldsmith and Elwood Memoranda were not disclosed to the public at the time of their creation in 2004 and 2009.  Their existence was first revealed on January 12, 2012 through public dissemination of another OLC memorandum to Counsel to President Obama from Viriginia Seitz, Assistant Attorney General, entitled "Re: Lawfulness of Recess Appointments During a Recess of the Senate Notwithstanding Periodic Pro Forma Sessions."  This memorandum, known as the "Seitz Memorandum," was written on January 6, 2012—two days after the January 4, 2012 appointments to the NLRB—and served as part of the government's response to public inquiry regarding the recess appointments.  (Doc. No. 16 ¶ 21; Doc. No. 16, Ex. F ["Seitz Memo."]).  It was subsequently published on January 12, 2012 on the OLC's website.  (Id.)

The Seitz Memorandum proclaimed to be a mere recitation of verbal advice previously given to Counsel to the President by the OLC before January 4, 2012, and it opined that the President had the authority to make recess appointments during the Senate's pro forma sessions. (Doc. No. 16 ¶ 23.)  The Seitz Memorandum refers to the Goldsmith Memorandum six times, and to the Elwood Memorandum once.  (Doc. No. 24 at 5-7.)

Samahon argues that the Goldsmith and Elwood Memoranda should be disclosed because they are referred to in the Seitz Memorandum, which itself was publicly discussed or referred to by the Obama Administration in two instances after its disclosure.

First, on January 12, 2012—the day on which the Seitz Memorandum was initially disclosed—journalists asked Presidential Press Secretary Jay Carney if the January 4 appointments were made without DOJ approval, because the Seitz Memorandum was dated two days after the appointments were made.  (See Doc. No. 24, Ex. H at 7.)  Mr. Carney responded:

8

> No.  The fact is the opinion was rendered verbally prior to the date of the opinion itself.  The opinion was based on the advice provided by OLC, and it is very standard for—especially a long—as you've seen in the lengthy opinion that was put out, for those things to be developed over a period of time.  And this is—the timeframe for this is very similar to, in my understanding, to previous occasion [sic].

(Id.)  Later in that briefing, with respect to the President's recess appointments, a different reporter asked Mr. Carney if the Obama Administration "[was] ready for those [litigation] fights when they do come?" (Id. at 9.)  Mr. Carney responded, "Well, I would just refer you to the OLC memo," referring to the Seitz Memorandum.  (Id.)

In the second instance, the United States Solicitor General cited the Seitz Memorandum once in its petition for certiorari and five times in a merits brief filed in the United States Supreme Court on behalf of the Obama Administration in the case involving the legality of the NLRB "recess" appointments.  (Doc. No. 24 at 8-9); Petition for Writ of Certiorari, NLRB v. Noel Canning, 134 S. Ct. 2250 (2014) (No. 12-1281) (2013 WL 1771081); Brief for Petitioner, NLRB v. Noel Canning, 134 S. Ct. 2550 (2014) (No. 12-1281) (2013 WL 5172004).

### B.    Samahon Requests the Goldsmith and Elwood Memoranda

On July 15, 2013, Samahon made the request for the release of the Goldsmith Memorandum from the OLC.  (Doc. No. 24 at 11.)  In response, on July 26, 2013, the OLC released a heavily redacted version of the Goldsmith Memorandum to Samahon, but refused to disclose an unredacted copy.  (Id., Ex. A.)  Seven sentences of the Goldsmith Memorandum survived redaction, all of which state the memorandum's conclusion.  (Doc. No. 24-2, Ex A.) Not to be dissuaded, Samahon requested a copy of the Elwood Memorandum on November 6, 2013.  (Doc. No. 24 at 12.)  On November 15, 2013, the OLC refused to disclose any part of the Elwood Memorandum, ultimately thwarting Samahon's research efforts.  (Id.)

9

The DOJ defends its decision to withhold the unredacted version of the Goldsmith Memorandum and the entire Elwood Memorandum by asserting that they are privileged and therefore excused from disclosure under Exemption 5 to FOIA, which permits an agency to withhold "inter-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency."  5 U.S.C. § 552(b)(5).  Under Exemption 5, three privileges are relied upon by the DOJ which would justify withholding the Goldsmith Memorandum as an inter-agency communication: (1) the deliberative process privilege; (2) the presidential communications privilege; and (3) the attorney-client privilege.  (Doc. No. 22-1 at 8.)  The DOJ is withholding the Elwood Memorandum on the basis that it is protected by two privileges arising under Exemption 5: (1) the deliberative process privilege and (2) the attorney-client privilege.  (Doc. No. 22-1 at 15.)

Conversely, Samahon claims that the DOJ waived its claims of privilege for the Goldsmith and Elwood Memoranda in two ways: first, because they were relied upon and cited in the Seitz Memorandum, which itself was adopted by President Obama and his administration; and second, because both documents should be categorized as "working law"[6] of the Obama Administration because they were adopted as official statements by Carney and in the petition for a writ of certiorari and the merits brief in the NLRB litigation in the United States Supreme Court.  (Doc. No. 24 at 2, 13, 19.)  The DOJ denies that it waived any privilege for either document.  (Doc. No. 22-1 at 2.)

In the alternative, Samahon claims that even if portions of either memorandum are properly subject to Exemption 5, it is nevertheless improper for the DOJ to withhold

---

[6]   "Working law" is a term used to describe an agency opinion or interpretation which "embod[ies] the agency's effective law and policy . . . ."  NLRB v. Sears, Roebuck & Co., 421 U.S. 132, 153 (1975).  If an agency document is categorized as "working law," Exemption 5 does not apply and the document must be disclosed.  Id.

"reasonably segregable" facts contained in them pursuant to § 552(b) of FOIA, which requires that "[a]ny reasonably segregable portion of a record [] be provided to any person requesting such a record after deletion of the portions which are exempt . . . ."  5 U.S.C. § 552(b); (Doc. No. 24 at 33.)  In defense, the DOJ claims that the privileged portions of both memoranda are not reasonably segregable from facts that would otherwise be subject to disclosure.

The Court will address first whether the Goldsmith and Elwood Memoranda are covered by privileges under Exemption 5, then will discuss whether the Obama Administration waived any privilege that would justify not disclosing the two memoranda.  Finally, the Court will consider whether the government is required to turn over any portion of the two memoranda that is reasonably segregable from privileged material.

## IV.   STANDARD OF REVIEW

Ordinarily, summary judgment is only appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  In this case, the material facts enumerated above are not in dispute.

Most FOIA actions are resolved by summary judgment.  See Lewis v. EPA, No. 06-2660, 2006 WL 3227787, at *2 (E.D. Pa. Nov. 3, 2006).  But the standard of review on summary judgment for FOIA actions is unique: "the familiar standard of appellate review promulgated by Federal Rule of Civil Procedure 56(c) does not apply, and the District Court is actually required to make distinct decisions as to factual questions."  Venkataram v. Office of Info. Policy, 590 F. App'x 138, 138 n.1 (3d Cir. 2014) (citations and internal quotation marks omitted).

Accordingly, when disposing of a FOIA case on summary judgment, the District Court must first have an "adequate factual basis for its determination."  Manna v. U.S. Dep't of Justice, 51 F.3d 1158, 1162 (3d Cir. 1995); see also Frankenberry v. FBI, 567 F. App'x 120, 121

(3d Cir. 2014).  In light of this requirement, the agency claiming an exemption to FOIA bears

the burden of proving that the claimed exemption applies by providing an adequate factual

basis.  <u>Manna</u>, 51 F.3d at 1163.  To satisfy its burden, the agency must "fil[e] affidavits

describing the material withheld and detailing why it fits within the claimed exemption."[7]  <u>Id.</u>

(internal quotation marks omitted).  These descriptive affidavits serve the purpose of informing

the Court and the FOIA requester of the contents of the documents:

> The significance of agency affidavits in a FOIA case cannot be underestimated.
> As, ordinarily, the agency alone possesses knowledge of the precise content of
> documents withheld, the FOIA requester and the court both must rely upon its
> representations for an understanding of the material sought to be protected.

<u>Id.</u> (quoting <u>McDonnell v. United States</u>, 4 F.3d 1227, 1241 (3d Cir. 1993)).  Thus, the agency's

explanation of the document in the affidavit must be "full and specific enough to afford the

FOIA requester a meaningful opportunity to contest, and the district court an adequate

foundation to review, the soundness of the withholding."  <u>Id.</u> at 1162-63 (quoting <u>McDonnell</u>, 4

F.3d at 1242).  In view of these requirements, the agency is entitled to summary judgment when

the affidavits

> describe the withheld information and the justification for withholding with
> reasonable specificity, demonstrating a logical connection between the
> information and the claimed exemption, and are not controverted by either
> contrary evidence in the record nor by evidence of agency bad faith.

---

[7]  This type of affidavit is known as a "Vaughn" Index.  Originating from the D.C. Circuit's
decision in <u>Vaughn v. Rosen</u>, 484 F.2d 820 (D.C. Cir. 1973), it is an "index correlating each
withheld document, or a portion thereof, with a specific exemption and relevant part of an
agency's justification for nondisclosure."  <u>Samahon v. FBI</u>, No. 12-4839, 2014 WL 4179933,
at *5 n.3 (E.D. Pa. Aug. 25, 2014) (quoting <u>Davin v. U.S. Dep't of Justice</u>, 60 F.3d 1043,
1047 n.1 (3d Cir. 1995)).

Id. at 1163-64 (quoting Am. Friends Serv. Comm. v. Dep't of Defense, 831 F.2d 441, 444 (3d Cir. 1987)).[8]  Importantly, the agency enjoys a presumption of good faith in the submission of these affidavits: "The court should not question the veracity of the agency's submissions explaining the reason for its nondisclosure unless there is evidence of bad faith." Andela v. Admin. Office of U.S. Courts, No. 13-0865, 2014 WL 695209, at *2 (E.D. Pa. Feb. 21, 2014), aff'd, 569 F. App'x 80 (3d Cir. 2014).

Moreover, FOIA cases demand an enhanced level of judicial scrutiny.  See Samahon v. FBI, No. 12-4839, 2014 WL 4179933, at *5 (E.D. Pa. Aug. 25, 2014) (quoting U.S. Dep't of Justice v. Reporters Comm. for Freedom of the Press, 489 U.S. 749, 755 (1989)).  In lieu of the "arbitrary and capricious" standard used for reviewing an agency determination, judicial review of an agency's denial of a FOIA request is de novo.  Id.; see also AT&T Inc. v. FCC., 582 F.3d 490, 496 (3d Cir. 2009), rev'd on other grounds, 131 S. Ct. 1177 (2011); Amro v. U.S. Customs Serv., 128 F. Supp. 2d 776, 781 (E.D. Pa. 2001).

## V.    FOIA

### A.    FOIA Overview

FOIA is a statute which "reflects a general philosophy of full agency disclosure unless information is exempted under clearly delineated statutory language." U.S. Dep't of Defense v. Fed. Labor Relations Auth., 510 U.S. 487, 494 (1994) (internal quotation marks omitted). Under FOIA, any agency, upon any request, must make records promptly available to any person.  Am. Civil Liberties Union of N.J. v. FBI, 733 F.3d 526, 531 (3d Cir. 2013) (quoting 5 U.S.C. § 552(a)(3)(A)) (internal quotation marks omitted).

---

[8]  Conversely, if "a district court determines that the agency's showing is inadequate to meet its burden . . . the court has jurisdiction 'to enjoin the agency from withholding agency records and to order the production of any agency records improperly withheld from the complainant.'" Samahon v. FBI, 2014 WL 4179933, at *5 (quoting 5 U.S.C. § 552(a)(4)(B)).

Generally, there is a presumption in favor of disclosure.  Manna, 51 F.3d at 1163.

However, "because public access to government information is not all encompassing," there are

nine categories of documents exempt from FOIA's broad disclosure requirements.  Am. Civil

Liberties Union of N.J., 733 F.3d at 531; see 5 U.S.C. § 552(b)(1)-(9).  These exemptions must

be "narrowly construed, because disclosure, not secrecy, is the dominant objective of the Act."

Andela, 2014 WL 695209, at *3 (quoting Dep't of Interior v. Klamath Water Users Protective

Ass'n, 532 U.S. 1, 7 (2001)) (internal quotation marks omitted).  Nevertheless, despite their

narrow application, "the statutory exemptions are intended to have meaningful reach and

application and should not be construed in a nonfunctional way."  Manna, 51 F.3d at 1163

(quoting John Doe Agency v. John Doe Corp., 493 U.S. 146, 152 (1989)).

## B.      Exemption 5

In this case, the DOJ argues that the Goldsmith and Elwood Memoranda are protected

from disclosure by privileges arising under FOIA's Exemption 5.  5 U.S.C. § 552(b)(5).

Exemption 5 spares from disclosure "inter-agency or intra-agency memorandums or letters

which would not be available by law to a party other than an agency in litigation with the

agency."  Id.  To qualify under Exemption 5, the document must satisfy the following two

preconditions: (1) "its source must be a Government agency;" and (2) "it must fall within the

ambit of a privilege against discovery under judicial standards that would govern litigation

against the agency that holds it."  Klamath, 532 U.S. at 8.

Here, it is not in dispute that the OLC is a government agency, satisfying the first

precondition.  "[A]gency is defined to mean each authority of the Government, and includes

entities such as Executive Branch departments, military departments, Government corporations,

Government-controlled corporations, and independent regulatory agencies."  Klamath, 532 U.S.

at 2 (citing 5 U.S.C. §§ 551(1), 552(f)) (citations and internal quotation marks omitted).  The

14

parties do not contest that the DOJ and the OLC are departments within the Executive Branch. Thus, the Goldsmith and Elwood Memoranda are the type of agency memoranda covered by Exemption 5.

Under the second precondition, Exemption 5 encompasses only those documents which fall within traditional discovery privileges. Abdelfattah v. U.S. Dep't of Homeland Sec., 488 F.3d 178, 184 (3d Cir. 2007); see also Conoco Inc. v. U.S. Dep't of Justice, 687 F.2d 724, 727 (3d Cir. 1982) (quoting NLRB v. Sears, Roebuck & Co., 421 U.S. 132, 149 (1975)) (internal quotation marks omitted) (stating that Exemption 5 protects any document which would be "normally privileged in the civil discovery context").

In this case, as noted above, the DOJ asserts that the Goldsmith Memorandum is protected under Exemption 5 by three separate privileges: the deliberative process, attorney-client, and presidential communications privileges. For the Elwood Memorandum, as a "file"[9] memorandum, the DOJ only claims protection under the deliberative process and attorney-client privileges.[10] Because these privileges can be asserted during discovery in litigation, the deliberative process, presidential communications, and attorney-client privileges fall within Exemption 5's ambit. See, e.g., Klamath, 532 U.S. at 2 ("Those privileges [covered by Exemption 5] include the privilege for attorney work product and the so-called 'deliberative

---

[9]  The DOJ characterizes the Elwood Memorandum as a "file" memorandum. (Colborn Decl. ¶ 19). A "file" memorandum is a term used to describe a communication from an agency employee to the agency file. See, e.g., Citizens Progressive Alliance v. U.S. Bureau of Indian Affairs, 241 F. Supp. 2d 1342, 1355 (D.N.M. 2002). Here, the DOJ claims that the Elwood Memorandum is a file memorandum because "it was never finalized or issued as an opinion of the Office, but it was preserved in OLC's files as a record of OLC's work on the issue." (Colborn Decl. ¶ 19.)

[10]  The presidential communications privilege would not apply to the Elwood Memorandum because it was never shared with the President or his personal counsel. (See Colborn Decl. ¶ 19.)

process privilege' . . . ."); <u>Judicial Watch, Inc. v. U.S. Dep't of Justice</u>, 365 F.3d 1108, 1113

(D.C. Cir. 2004) ("Exemption 5 also has been construed to incorporate the presidential

communications privilege.").  Thus, the DOJ has met its initial burden of proving that the

Goldsmith and Elwood Memoranda are eligible for protection under Exemption 5.

## VI.    ANALYSIS

### A.    The DOJ Has Provided an Adequate Factual Basis for the Court to Determine Whether the Memoranda Are Protected by a Privilege

On an additional threshold matter, the DOJ has provided the Court with an adequate

factual basis of the contents of the Goldsmith and Elwood Memoranda to determine whether

privilege would protect the memoranda from disclosure.  As noted above, "before evaluating

whether an asserted exemption to disclosure applies, a district court must ensure that it has an

'adequate factual basis' to make an informed determination."  <u>Samahon</u>, 2014 WL 4179933, at

*5 (citing <u>McDonnell</u>, 4 F.3d at 1242).  In this case, the DOJ provided a sixteen-page affidavit

of OLC Special Counsel Paul P. Colborn which details the type of information and advice

enumerated in the Goldsmith and Elwood Memoranda.  (Doc. No. 22-1 at 5; Doc. 22-2,

Declaration of Paul P. Colborn [hereinafter "Colborn Decl."].)

The Colborn affidavit satisfies the DOJ's burden to provide such an adequate factual

basis on matters of privilege.  The affidavit details the context, purpose, and subsequent

utilization of the memoranda by the OLC and presidential administrations, and parts of the

affidavit are cited below in discussing the Goldsmith and Elwood Memoranda.  The affidavit

also provides Samahon an adequate basis to contest the withholding because Samahon has filed

a detailed Complaint and Motion for Summary Judgment based on this information.  Moreover,

as will be evident by the analysis below, the affidavit roadmaps a logical connection between

the information sought to be disclosed and Exemption 5, enabling the Court to adequately

"review the soundness of the withholding." See Manna, 51 F.3d at 1162-64.[11]

### B.   The Goldsmith and Elwood Memoranda Were Properly Withheld Under Exemption 5

#### 1.   Deliberative process privilege

The deliberative process privilege covers "documents reflecting advisory opinions,

recommendations and deliberations comprising part of a process by which governmental

decisions and policies are formulated." Sears, Roebuck & Co., 421 U.S. at 150.  The crucial

purpose of this privilege is to prevent a chilling effect on the political decisionmaking process—

it "rests on the obvious realization that officials will not communicate candidly among

themselves if each remark is a potential item of discovery and front page news . . . ." Klamath,

532 U.S. at 8-9.  By extension, such unfettered freedom to engage in "open and frank

discussion" promotes the quality of agency deliberations and resulting agency policy.  Id.

Agency memoranda must satisfy two criteria to qualify for the deliberative process

privilege covered by Exemption 5: they must be both predecisional and deliberative.

Abdelfattah, 488 F.3d at 183.  A document is "predecisional" when it is "prepared in order to

assist an agency decisionmaker in arriving at his decision . . . ." Renegotiation Bd. v. Grumman

Aircraft Eng'g Corp., 421 U.S. 168, 184 (1975).  By definition, the document must be received

---

[11]  If the district court in a FOIA case finds that a government affidavit does not adequately establish a factual foundation for a decision, it may order an in camera review of withheld documents.  5 U.S.C. § 552(a)(4)(B) ("[The court] may examine the contents of such agency records in camera to determine whether such records or any part thereof shall be withheld.")  Additionally, the court may hold an ex parte hearing to accomplish the same purpose. Samahon, 2014 WL 4179933, at *5 (citing Long v. IRS, 742 F.2d 1173, 1182 (9th Cir. 1984)).  Because the Colborn affidavit serves the purpose of providing an adequate factual basis to determine whether a privilege under Exemption 5 is applicable here, these measures were not necessary in this case in order to make such a determination.  However, because the affidavit did not provide in sufficient detail why it was necessary to withhold factual matter contained in the Elwood Memorandum, in camera review by the Court of this Memorandum is warranted.  See infra Section IV.D.1.

by the decisionmaker before the decision is made.  Berger v. IRS, 487 F. Supp. 2d 482, 498

(D.N.J. 2007).  "A document is 'deliberative' when it reflects the give-and-take of the

consultative process."  Manna v. U.S. Dep't of Justice, 815 F. Supp. 798, 815 (D.N.J. 1993),

aff'd, 51 F.3d 1158 (3d Cir. 1995).  Put differently, a document is deliberative if "it makes

recommendations or expresses opinions on legal or policy matters."  State of Delaware Dep't of

Natural Res. & Envtl. Control v. U.S. Army Corp of Eng'rs, 722 F. Supp. 2d 535, 544 (D. Del.

2010) (quoting Vaughn v. Rosen, 523 F.2d 1136, 1143-44 (D.C. Cir. 1975)).

In contrast to the concepts of "predecisional" and "deliberative" are finalized agency

memoranda and opinions that summarize a decisionmaker's final disposition of an issue or

claim.  Final opinions must be disclosed pursuant to the statute because they "not only

invariably explain agency action already taken or an agency decision already made, but also

constitute final dispositions of matters by an agency" under the statute.  Sears, Roebuck & Co.,

421 U.S. at 153-54 (citing 5 U.S.C. § 552(a)(2)).  These final decisions are not protected by

Exemption 5 because it would not "intrude on predecisional processes" or affect the quality of

the final decision.  Id. at 155.

### a.  Goldsmith Memorandum

The Goldsmith Memorandum contains written advice provided to Counsel for President

George W. Bush in February 2004 regarding the recess appointment power of the President.

Specifically, the Colborn Affidavit describes the Goldsmith Memorandum, in relevant part, as

follows:

> This Memorandum was prepared by OLC in response to a request from the
> Counsel to the President seeking OLC's opinion regarding whether the President
> had authority to make recess appointments during the ongoing intrasession recess
> of the Senate of eleven days.  The President's Counsel requested OLC's legal
> advice to assist the President in his deliberations regarding whether to make a
> recess appointment during that recess.  The Goldsmith Memorandum advised the
> President's Counsel that OLC had concluded that the President had the authority

to make a recess appointment during an intrasession recess of that length. In providing that advice, OLC provided a candid legal analysis of the issue. (On February 20, 2004, President Bush appointed William H. Pryor Jr. to serve as a judge on the U.S. Court of Appeals for the Eleventh Circuit.) . . . .

After providing the Goldsmith Memorandum to the Counsel for the President, OLC, consistent with Office practice, considered whether to publish the Memorandum, and determined that it was not appropriate for publication. Accordingly, the Goldsmith Memorandum has not been made public, and its existence was disclosed publicly only when it was cited in OLC's Recess Appointments Opinion [Seitz Memo.].

(Colborn Decl. ¶¶ 17-18.)

Based on Colborn's factual description of the Goldsmith Memorandum, it is clear that the information contained therein is protected by the deliberative process privilege. The Goldsmith Memorandum was predecisional because the Memorandum was provided to the President on February 20, 2004—the day that George W. Bush appointed William H. Pryor to the Court of Appeals for the Eleventh Circuit during an intrasession recess of the Senate. The fact that the Goldsmith Memorandum was dated the same day that President Bush made the appointment does not create an inference that the OLC Memorandum was a "final agency decision." See Citizens for Responsibility and Ethics in Washington v. Office of Admin., 249 F.R.D. 1, 6 (D.D.C. 2008) (finding that although an OLC memorandum was dated the same day of the Office of Administration final decision, the OLC memorandum did not serve as the final agency decision).

The Goldsmith Memorandum is also deliberative. It was prepared merely to assist and advise on relevant law and policy to aid the President in his consideration of the appointment. It made a recommendation, was not a directive, and clearly falls within the scope of being an "advisory opinion[], recommendation[] and deliberation[] comprising part of a process by which governmental decisions and policies are formulated." Sears, Roebuck & Co., 421 U.S. at

150.  Moreover, the Goldsmith Memorandum does not summarize the President's action.  See

Cozen O'Connor v. U.S. Dep't of Treasury, 570 F. Supp. 2d 749, 780 (E.D. Pa. 2008) ("Post-

decisional communications that explain decisions are not exempt.")

### b.   Elwood Memorandum

Turning to the second memorandum in issue, Colborn describes the contents of the

Elwood Memorandum, also an OLC advice memorandum, as follows:

> That file Memorandum contains a draft legal analysis, prepared for Counsel to
> the President, that considers whether it would be lawful for the President to make
> recess appointments during an adjournment of the Senate, notwithstanding the
> Senate's meeting in periodic pro forma sessions approximately every three days.
> The draft legal analysis was prepared as possible legal advice to the Counsel to
> the President for use in connection with a potential presidential decisionmaking
> process.  It was never finalized or issued as an opinion of the Office, but it was
> preserved in OLC's files as a record of OLC's work on the issue.
>
> Because the Elwood File Memorandum consists of draft legal analysis that was
> never finalized as a formal OLC opinion, OLC of course did not consider
> publishing it.  The Memorandum has not been made public.  As with the
> Goldsmith Memorandum, the existence of the File Memorandum was disclosed
> publicly only when it was referred to in the Recess Appointments Opinion [Seitz
> Memo.].

(Colborn Decl. ¶¶ 19-20.)

The Elwood Memorandum is clearly predecisional because it was never delivered to

Counsel for President Obama.  As a file memorandum, it reflects no final agency policy that

was adopted or became a final opinion.  It contains only a draft of legal analysis that may be

provided to Counsel to the President for use in connection with any future presidential

decisionmaking on recess appointments during an adjournment of the Senate notwithstanding

periodic pro forma sessions.  The Elwood Memorandum is also purely deliberative in nature.  It

contains only possible future advice, and does not purport to express the OLC's final views on

recess appointments, much less the views of the DOJ or the President.

### 2.  Attorney-client privilege

The OLC further claims that both the Goldsmith and Elwood Memoranda are protected from disclosure by Exemption 5 under the attorney-client privilege.  The attorney-client privilege, along with the deliberative process privilege, is an "essential ingredient[] of [E]xemption 5" because its protections further promote informed decisions through full and frank discussion:

> In order to ensure that a client receives the best possible legal advice, based on a full and frank discussion with his attorney, the attorney-client privilege assures him that the confidential communications to his attorney will not be disclosed without his consent.  We see no reason why this same protection should not be extended to an agency's communications with its attorneys under [E]xemption 5.

Mead Data Cent. Inc., v. U.S Dep't of Air Force, 566 F.2d 242, 248, 252 (D.C. Cir. 1977); see also Sears, Roebuck & Co., 421 U.S. at 154 (finding that Exemption 5 incorporates the attorney-client privilege).

To invoke the attorney-client privilege, a party must demonstrate that there was: "(1) a communication (2) made between privileged persons (3) in confidence (4) for the purpose of obtaining or providing legal assistance for the client."  In re Teleglobe Commc'ns Corp., 493 F.3d 345, 359 (3d Cir. 2007).  In a FOIA case, the agency "must show that the withheld document (1) involves confidential communications between an attorney and his client and (2) relates to a legal matter for which the client has sought professional advice."  Judicial Watch, Inc. v. U.S. Dep't of Treasury, 802 F. Supp. 2d 185, 200 (D.D.C. 2011) (citations and internal quotation marks omitted)); see also Conservation Force v. Jewell, No. 12-cv-1665, 2014 WL 4327949, at *10 (D.D.C. Sept. 2, 2014) (holding that the agency must show that the communications "reflect" a confidential communication between a lawyer and client.").

Specifically, the privilege operates not only from a client to the attorney, but from the attorney to the client so long as the information in the documents was "communicated to or by

an attorney as part of a professional relationship in order to provide the [client] with advice on the legal ramifications of its actions."  Mead Data, 566 F.2d at 253; see also United States v. Amerada Hess Corp., 619 F.2d 980, 986 (3d Cir. 1980) (recognizing the two-way application of attorney-client privilege in federal courts).  However, an important limitation of the privilege is that it "does not extend to facts provided by an attorney that do not reflect client confidences."[12] COMPTEL v. FCC, 910 F. Supp. 2d 100, 119 (D.D.C. 2012) (citing Brinton v. Dep't of State, 636 F.2d 600, 603 (D.C. Cir. 1980)).

Both the Goldsmith and Elwood Memoranda are protected by the attorney-client privilege.  At the request of Counsel to the President, the documents were prepared by the OLC in its capacity as a legal adviser to the Executive Branch.  (Colborn Decl. ¶¶ 23, 29.)  Thus, attorney-client conversations led to the preparation of both memoranda.  (Id.)  These are protected confidential communications.  Thereafter, the memoranda were prepared which offered legal advice concerning the President's authority to make recess appointments during Senate intrasession recesses.  By their very nature, they would contain information relating to communications between an attorney and the client.

---

[12] Unlike the attorney work product privilege, which "protects disclosure of materials prepared by attorneys . . . in contemplation of litigation, that reveal information about an attorney's preparation and strategy relating to a client's case," the attorney-client privilege covers only confidential facts or disclosures made between client and attorney.  "The attorney-client privilege is intended to protect 'only those disclosures necessary to obtain informed legal advice which might not have been made absent the privilege.'"  Pa. Dep't of Pub. Welfare v. United States, No. 05-1285, 2006 WL 3792628, at *19 (W.D. Pa. Dec. 21, 2006) (quoting Judicial Watch, Inc. v. U.S. Postal Serv., 297 F. Supp. 2d 252, 268 (D.D.C. 2004) and citing Coastal States Gas Corp. v. Dep't of Energy, 617 F.2d 854, 862-63 (D.C. Cir. 1980)).  Thus, under the attorney-client privilege, any reasonably segregable facts or statements contained in the Elwood and Goldsmith Memoranda that would not reveal such confidential communications or disclosures between client and attorney may be subject to disclosure under FOIA.

The Goldsmith Memorandum was given to Counsel to the President by the OLC, which renders it a classic communication covered by the attorney-client privilege.  Information was provided by the client, and based on that information, advice was rendered and delivered by the attorney to the client.  (Id. ¶ 23); see Mead Data, 566 F.2d at 253.  In contrast, the fact that the Elwood Memorandum was never delivered to Counsel for the President does not negate the attorney-client privilege.  As the court held in Mead Data, the information contained in the draft memorandum was necessarily the product of communications from Counsel to the President to the OLC.  Moreover, the Colborn Declaration provides:

> The attorney-client privilege also applies to the limited factual material contained in the Elwood File Memorandum.  The limited factual material contained in the Memorandum was provided to OLC by the Office of the Counsel to the President for purposes of obtaining confidential legal advice. Having been asked to provide legal advice, OLC attorneys stood in a special relationship of trust with the President and his Counsel.  Disclosure of client confidences in the course of seeking legal advice would seriously disrupt the relationship of trust so critical when attorneys formulate legal advice to their clients.

(Colborn Decl. ¶ 29.)

Thus, because the OLC and Counsel to the President were communicating in regard to both memoranda in a confidential counsel and client relationship for the purpose of obtaining legal assistance for the client, the attorney-client privilege applies.  Neither memorandum has been fully disclosed to date and their release would violate this privilege.[13]

---

[13]  Samahon claims that the OLC has failed to maintain confidentiality of the Goldsmith and Elwood Memoranda.  As discussed infra in Section IV.C, the limited reference to facts and legal conclusions contained in both memoranda, which was made in the Seitz Memorandum, does not destroy confidentiality for purposes of the attorney-client privilege, or for any privilege covered by Exemption 5.

### 3.  Presidential communications privilege

Lastly, the OLC claims that the Goldsmith Memorandum is protected by the presidential

communications privilege.[14] The presidential communications privilege is "closely affiliated"

with the deliberative process privilege.  In re Sealed Case, 121 F.3d 729, 745 (D.C. Cir. 1997).

The presidential communications privilege applies to "communications in performance of a

President's responsibilities . . . and made in the process of shaping policies and making

---

[14] Preliminarily, Samahon argues that the OLC should be barred from asserting the presidential communications privilege because the OLC and the Office of Information Policy did not rely on this privilege as a reason for nondisclosure in the denial letters dated July 19, 2013 and September 10, 2013, citing Judicial Watch, Inc. v. Gen. Servs. Admin., No. 98-2223, 2000 WL 35538030, at *4 (D.D.C. Sept. 25, 2000); (Doc. No. 24 at, 26; Exs. B, C).  In Judicial Watch, the court noted that "the courts may not consider new reasons by the agency that were not advanced in its denial letter," relying on Independence Mining Co. v. Babbit, 105 F.3d 502, 511-12 (9th Cir. 1997) which cites Industrial Union Dep't v. American Petroleum Inst., 448 U.S. 607, 631 n.31 (1980) and Securities and Exchange Comm'n v. Chenery Corp., 318 U.S. 80, 95 (1943).  This Court has reviewed the pertinent language in Independence Mining Co., which contains this proposition. It is supported with citations to Industrial Union Dep't and Securities and Exchange Comm'n.  Neither case in the pages cited support the proposition that a new rationalization cannot be asserted in a de novo proceeding before the district court.

Because FOIA directs district courts to review agency actions de novo, see 5 U.S.C. § 552(a)(4)(B), an agency is not barred from invoking a particular exemption in litigation merely because that exemption was not cited in responding to the request at the administrative level.  See Young v. CIA, 972 F.2d 536, 538-39 (4th Cir. 1992) ("[A]n agency does not waive FOIA exemptions by not raising them during the administrative process."); Finney v. Soc. Sec. Admin., No. 2:12-cv-2805-TLN-EFB PS, 2014 WL 1025561, at *8 n.4 (E.D. Cal. Mar. 14, 2014) (Social Security Administration did not waive its right to claim an exemption for failing to state in its response to the plaintiff's administrative appeal that this was the reason for its decision); Frito Lay v. EEOC, 964 F. Supp. 236, 238 (W.D. Ky. 1997) ("[A]n agency's failure to raise an exemption at any level of the administrative process does not constitute a waiver of that defense.").  By not asserting the presidential communications privilege in the denial letters, the OLC did not waive this privilege de novo in a judicial proceeding.  Rather, the agency may assert all grounds for nondisclosure during the district court proceedings, which the OLC has done in this case.  Maydak v. U.S. Dep't of Justice, 218 F.3d 760, 764 (D.C. Cir. 2000) ("[A]s a general rule, [the government] must assert all exemptions at the same time, in the original district court proceedings."); Sciba v. Bd. of Gov. of Fed. Reserve Sys., No. 04-1011, 2005 WL 758260, at *1 n.3 (D.D.C. Apr. 1, 2005) (concluding that an "exemption need only be raised at a point in the district court proceedings that gives the court an adequate opportunity to consider it.")  Thus, the presidential communications privilege has been properly asserted here.

decisions." Nixon v. Adm'r of Gen. Servs., 433 U.S. 425, 449 (1977) (quotations and alterations omitted). The privilege is "fundamental to the operation of Government and inextricably rooted in the separation of powers under the Constitution." United States v. Nixon, 418 U.S. 693, 708 (1974) (footnote omitted).

Undergirding the privilege is the notion that "[a] President and those who assist him must be free to explore alternatives in the process of shaping policies and making decisions and to do so in a way many would be unwilling to express except privately." Id. at 708. Thus, the President himself need not be a party to the communication or specifically invoke the privilege in order for it to apply. As long as the communications are "intimately connected" to presidential decisionmaking, the presidential communications privilege applies. Judicial Watch v. Consumer Fin. Prot. Bureau, No. 12-cv-00931, 2014 WL 1245303, at *8 (D.D.C. Mar. 27, 2014) (quoting In re Sealed Case, 121 F.3d at 752-53). The Court of Appeals for the District of Columbia Circuit has held that the privilege extends to shield "communications that [] advisers and their staff author or solicit and receive in the course of performing their function of advising the President on official government matters." In re Sealed Case, 121 F.3d at 752. Specifically,

> the privilege should not extend to staff outside the White House in executive branch agencies. Instead, the privilege should apply only to communications authored or solicited and received by those members of an immediate White House adviser's staff who have broad and significant responsibility for investigating and formulating the advice to be given the President on a particular matter to which the communications relate.

Id. at 752; see also Judicial Watch, Inc. v. Dep't of Justice, 353 F.3d 1108, 1123 (D.C. Cir. 2004) (upholding In re Sealed Case, but further specifying that the "presidential communications privilege applies to pardon documents 'solicited and received' by the President or his immediate advisors in the Office of the President, and that the deliberative process privilege applies to internal agency documents that never make their way to the Office of the President").

25

The court in In re Sealed Case noted that the presidential communications privilege applies even when the President is not a direct party to the communication because the communication is made to aid the President in the exercise of his appointment power.  As the Court explained:

> In this case the documents in question were generated in the course of advising the President in the exercise of his appointment and removal power, a quintessential and nondelegable Presidential power.  In many instances, presidential powers and responsibilities, for example the duty to take care that the laws are faithfully executed, can be exercised or performed without the President's direct involvement, pursuant to a presidential delegation of power or statutory framework.  But the President himself must directly exercise the presidential power of appointment or removal.  As a result, in this case there is assurance that even if the President were not a party to the communications over which the government is asserting presidential privilege, these communications nonetheless are intimately connected to his presidential decisionmaking.  In addition, confidentiality is particularly critical in the appointment or removal context; without it, accurate assessments of candidates and information on official misconduct may not be forthcoming.

Based on this reasoning in In re Sealed Case, it follows that the Goldsmith Memorandum falls squarely within the presidential communications privilege because it was communicated to one of the President's senior advisors—the Counsel for the President—in connection with the President's deliberations and use of his appointment power—a "quintessential and nondelegable Presidential power."

### C.    The Department of Justice Did Not Waive Any Privilege Under Exemption 5 Protecting the Goldsmith and Elwood Memoranda

The privileges covered by Exemption 5 are not absolute and can be waived in two discrete ways.  Samahon argues that both apply here.  The waivers are known as the "adoption or incorporation" and the "working law" waivers, and if applicable here, would compel disclosure of the Goldsmith and Elwood Memoranda.  Because of the interest in protecting the decisionmaking process, however, waiver of privilege should not be "lightly inferred."  See

26

Elec. Frontier Found. v. U.S. Dep't of Justice, 890 F. Supp. 2d 35, 47 (D.D.C. 2012) (citing In re

Sealed Case, 121 F.3d at 741).[15]

First, the deliberative process, attorney-client, and presidential communications

privileges can be waived "if the agency has chosen 'expressly to adopt or incorporate by

---

[15] Samahon also argues that the DOJ waived the attorney-client privilege for both memoranda under the "fairness" exception to the attorney-client privilege.  (Doc. No. 24 at 30.)  Under the fairness doctrine, "courts have found an implied waiver of all confidential attorney-client communications when the party asserting the privilege uses the privilege both as a sword and a shield by selectively disclosing communications to gain an advantage in litigation." O'Kinsky v. Perrone, No. 10-6075, 2012 WL 4835316, at *2 (E.D. Pa. Oct. 11, 2012) (citing In re Chevron Corp., 633 F.3d 153 (3d Cir. 2011)).  The fairness exception exists to prevent any selective disclosures from prejudicing an adversary in litigation.  See Robert Bosch LLC v. Pylon Mfg. Corp., 263 F.R.D. 142, 145 (D. Del. 2009) (citing In re Teleglobe Commc'ns Corp., 493 F.3d 345, 361 (3d Cir. 2007)).  Samahon claims he was prejudiced by selective disclosure in two instances:

> Here, the DOJ has disclosed only select portions of the Goldsmith Memorandum, all of which support [the] OLC's ultimate conclusions, but has refrained from providing any portions to the contrary.  Furthermore, the DOJ wields the sword of selective disclosure before the Supreme Court in arguing for the constitutionality of the President's appointments, but throws up the shield of attorney-client privilege when Professor Samahon, or any citizen, asks for a full review of the President's adopted analysis.  The attorney-client privilege is not meant to be abused in such a manner.

(Doc. No. 24 at 30.)

Samahon's arguments under the fairness doctrine are not persuasive because he does not distinguish between waiver of the attorney-client privilege through selective disclosure in the traditional litigation context and waiver of the privilege in FOIA cases.  As mentioned, the primary purpose behind the fairness doctrine is to prevent unfair prejudice to a party in litigation.  Thus, Samahon's argument fails because the OLC did not use the selective disclosures of the Goldsmith or Elwood Memoranda as a weapon in any litigation context with Samahon—rather, these disclosures were made months earlier in the Seitz Memorandum, which in turn was discussed by Jay Carney and cited in the Noel Canning petition for certiorari and merits brief.  In the FOIA context, Exemption 5 and other statutory exemptions involve different considerations reflecting a congressional balance of interests in FOIA as opposed to "fairness" guided by "relevance, need, and applicable privileges" in the non-FOIA civil litigation.  Stonehill v. IRS, 558 F.3d 534, 538 (D.C. Cir. 2009).  To hold that a court could infer waiver from agency positions taken in separate civil proceedings, as Samahon argues here, would undermine the purpose of Exemption 5 and waiver through "adoption or incorporation" which is discussed infra Section IV.C.1.

reference [a] . . . memorandum previously covered by Exemption 5 in what would otherwise be a final opinion.'" <u>Nat'l Council of La Raza v. U.S. Dep't of Justice</u>, 411 F.3d 350, 356 (2d. Cir. 2005) (quoting <u>NRLB v. Sears, Roebuck & Co.</u>, 421 U.S. 132, 161 (1975)). This exception has since been coined the "adoption or incorporation" exception. See <u>N.Y. Times Co. v. U.S. Dep't of Justice</u>, No. 12-3215, 2013 WL 174222, at * 6 (S.D.N.Y. Jan. 7, 2013).

Second, a memorandum is not subject to Exemption 5 if it constitutes the "working law" of the agency. As explained by the Supreme Court, "the public is vitally concerned with the reasons which did supply the basis for an agency policy actually adopted. These reasons, if expressed within the agency, constitute the 'working law' of the agency and have been held . . . to be outside the protection of Exemption 5." <u>Sears, Roebuck & Co.</u>, 421 U.S. at 152-53.

In view of this waiver framework, the Court will first address the "adoption or incorporation" exception, and then the "working law" exception.

## 1. The "adoption or incorporation" exception does not apply to the Goldsmith and Elwood Memoranda

Samahon argues that by adopting the Seitz Memorandum, the Obama Administration by extension has adopted the Goldsmith and Elwood Memoranda, thus waiving any privileges protecting from release these undisclosed memoranda. Although the Seitz Memorandum has been publicly disclosed by the OLC, it does not automatically follow that this Memorandum has been adopted by the President. Therefore, it is still critical to determine whether the Seitz Memorandum has been adopted by the President because if he did not do so, then as a matter of logic the Goldsmith Memorandum and the Elwood Memorandum also were not adopted and therefore no waiver of the protection of Exemption 5 applies to them.

28

Generally, documents that have been expressly adopted or incorporated by reference into a final agency opinion or decision lose Exemption 5's protective shield.[16]  See Cuccaro v. Sec'y of Labor, 770 F.2d 355, 358 (3d Cir. 1985) (quoting Sears, Roebuck & Co., 421 U.S. at 161); see also Coastal States Gas Corp. v. Dep't of Energy, 617 F.2d 854, 866 (D.C. Cir. 1980) ("[E]ven if the document is predecisional at the time it is prepared, it can lose that status if it is adopted, formally or informally, as the agency position on an issue or is used by the agency in its dealings with the public.").

In relevant case law, two requirements are necessary to effectuate this type of waiver. First, the memorandum at issue must be a final agency opinion or decision.  Second, if the document at issue is considered a final agency opinion or decision, the "decisionmaker" or "policymaker" at issue, be it an individual or an agency, must expressly adopt or incorporate the document in a final opinion or disposition.  Sears, Roebuck & Co., 421 U.S. at 161.  In addition to expressly adopting the conclusion of the opinion or decision, the decisionmaker must expressly adopt its underlying reasoning.  See Renegotiation Bd. v. Grumman Aircraft Eng'g Corp., 421 U.S. 168, 184-85 (1975).

---

[16]  The purpose behind the "adoption or incorporation" waiver is straightforward.  Unlike the chilling effect on deliberations that disclosure of pre-decisional and deliberative memoranda can have on the decisionmaking process, once a memorandum becomes adopted or incorporated into a final agency decision, this concern no longer exists.  As the Supreme Court explained in Sears, Roebuck & Co.:

> The probability than an agency employee will be inhibited from freely advising a decisionmaker for the fear that his advice, if adopted, will become public is slight.  First, when adopted, the reasoning becomes that of the agency and becomes its responsibility to defend.  Second, agency employees will generally be encouraged rather than discouraged by public knowledge that their policy suggestions have been adopted by the agency.  Moreover, the public interest in knowing the reasons for a policy actually adopted supports [disclosure of the document.]

421 U.S. at 161.

### a. The Seitz Memorandum is a final opinion of the OLC for FOIA purposes

Preliminarily, the adoption or incorporation exception applies only where the documents sought to be disclosed have been incorporated into a final agency opinion or decision.  See La Raza, 411 F.3d at 356 (quoting Sears, Roebuck & Co., 421 U.S. at 161).  In this regard, the DOJ argues that waiver cannot apply to the Seitz Memorandum because it is not a "final agency opinion" that can be adopted.  Specifically, the DOJ argues that in order for the memorandum to be considered a final opinion capable of adoption, it must be "a final decision by an agency policymaker," (Doc. No. 25 at 4), and that the OLC is not a policymaker.

The DOJ, however, misinterprets the difference between a final opinion and a "final decision by an agency policymaker."  Although the OLC is not an agency policymaker and its memoranda are not binding on those who request it, an OLC memorandum is still final when it serves as the OLC's last word on the subject matter that was provided to the decisionmaker who requested it.  Here, the Seitz Memorandum was in fact the last word by the OLC on the subject of recess appointments during pro forma sessions of the Senate.  The OLC even voluntarily chose to disclose the Seitz Memorandum to the public, further evidencing its finality.  Thus, to find to the contrary would essentially immunize all OLC memoranda from waiver, which is clearly contrary to case law.  See, e.g., La Raza, 411 F.3d at 357-58 (holding that the Department of Justice waived an advisory OLC memorandum under the adoption or incorporation exception); N.Y. Times Co. v. U.S. Dep't of Justice, 756 F.3d 100, 113 (2d Cir. 2014) (finding waiver of the deliberative process privilege for a joint OLC-Department of Defense memorandum through adoption).  Thus, for FOIA waiver purposes, the Seitz Memorandum is a final decision or opinion of the OLC.

**b.  The Obama Administration did not expressly adopt or
incorporate the reasoning of the Seitz Memorandum**

The second prong of the adoption or incorporation waiver requires the decisionmaker to

expressly adopt both the conclusion and reasoning of the memorandum in question.  In this

case, the relevant decisionmaker is President Obama and his administration, not the OLC.  See

N.Y. Times, 2013 WL 174222, at *6.

There is no dispute that President Obama adopted the conclusion of the Seitz

Memorandum.  The Seitz Memorandum concluded that recess appointments, notwithstanding

pro forma sessions of the Senate, were constitutional.  (Seitz Memo. at 1.)  Because President

Obama made the recess appointments during one of the Senate's pro forma sessions, he clearly

adopted the conclusion in the Seitz Memorandum.

Next, waiver in this case would then hinge on whether the Obama Administration[17]

adopted the reasoning of the Seitz Memorandum.  In order for waiver to apply, the

---

[17] Case law does not precisely list which members of a president's administration are capable of
"adopting or incorporating" an OLC memorandum, thus waiving privilege under Exemption
5.  Courts have found waiver when high-ranking or senior members of the administration
adopt or incorporate the contents of an OLC memorandum.  For example, in New York
Times Co. v. U.S. Department of Justice, the Second Circuit found waiver where the Legal
Adviser of the State Department, the General Counsel of the Department of Defense, the
Attorney General, and the Assistant to the President for Homeland Security and
Counterterrorism all adopted by reference an OLC memorandum written to the Department
of Defense. 756 F.3d 100, 114-15 (2d Cir. 2014).  Similarly, in National Council of La Raza
v. U.S. Dep't of Justice, "the repeated references to [an] OLC Memorandum made by the
Attorney General and his high-ranking advisors" waived the deliberative process privilege.
411 F.3d 350, 357 (2d Cir. 2005).  The government in La Raza argued that the Attorney
General, as the relevant decisionmaker, was the only person with authority to adopt or
incorporate an OLC memorandum.  The court, however, refused to draw a distinct line
separating which agency employees had authority to effectuate waiver through adoption or
incorporation.  Instead, the court intimated that statements made by individuals who lack
authority to set department policy would nevertheless be construed as circumstantial
evidence of the Department's position on the matter.  Id. at 357 n.6.

decisionmaker must not only adopt the conclusion, but must also expressly[18] adopt the reasoning contained in that document.  Id. at *6 (citing Brennan Ctr. for Justice v. U.S. Dep't of Justice, 697 F.3d 184, 203 (2d Cir. 2012)) ("Mere reliance on a document's conclusions does not necessarily involve reliance on a document's analysis; both will ordinarily be needed before a court may properly find adoption or incorporation by reference.").  Here, there is no evidence that President Obama or any member of his administration expressly incorporated the reasoning of the Seitz Memorandum, and by extension, the reasoning of the Goldsmith and Elwood Memoranda.

In considering this issue, the Court must refrain from engaging in mind reading: if it is "not possible to know whether the [decisionmaker] agreed with the reasoning of the [report] or just its conclusion," the document remains protected by Exemption 5.  Renegotiation Bd., 421 U.S. at 179.  This abstention is required because "a decisionmaker may agree with a memorandum's conclusions but for unspecified and different reasons; [or] alternatively, the memorandum may be consistent with a decision the decisionmaker was already contemplating." N.Y. Times, 2013 WL 174222, at *6.  It follows that  "where a decisionmaker, 'having reviewed a subordinate's non-binding recommendation, makes a 'yes' or 'no' determination without providing any reasoning at all, a court may not infer that the agency is relying on the reasoning contained in the subordinate's report.'"  Id. (quoting La Raza, 411 F.3d at 359)  Thus, in the face

---

[18] There is no bright-line test for determining whether an adoption or incorporation was "expressly" made.  See La Raza, 411 F.3d at 357 n.5 (declining to hold that only an agency's specific, explicit language constitutes an "express" adoption).  Rather, "courts must examine all the relevant facts and circumstances in determining whether express adoption or incorporation by reference has occurred."  Id.

of a bald conclusion or decision, it would be improper for a court to find an inference of adoption or incorporation.[19]

### c.   "Temporal proximity" between the recess appointments and the Seitz Memorandum is too speculative to infer adoption

In support of his argument that the Obama Administration adopted the reasoning of the Seitz Memorandum, Samahon first claims that the "temporal proximity" between President Obama's recess appointments on January 4, 2012 and the fact that the oral advice from the OLC was given to him the same day, "raises a presumption that the advice and conclusion that were eventually memorialized in the Seitz Memorandum were adopted as policy." (Doc. No. 24 at 17.) This argument is untenable, however, simply because it is based on speculation. See N.Y. Times, 2013 WL 174222, at *8 ("[C]ircumstantial evidence of action in conformity with the conclusion of an OLC memorandum is not sufficient to show express adoption of the reasoning of that memorandum, let alone the reasoning and conclusion of the memoranda cited in that memorandum." (emphasis in original)).

---

[19]  Courts have used an in camera inspection to determine whether the withheld memorandum actually lines up with the decisionmaker's conclusion and reasoning. See Citizens for Responsibility and Ethics in Washington v. Office of Admin., 249 F.R.D. 1, 8 (D.D.C. 2008) ("Thus, even if the OLC Memo reached the same conclusion as the Executive Branch's collaborative process, the Court could not assume—in the absence of evidence indicating that the conclusion was reached on the same grounds—that the Executive Branch actually adopted the OLC Memo.  Moreover, having now reviewed the OLC Memo in camera, it is clear to the Court that any such assumption would be entirely inappropriate.  The analysis contained in the OLC Memo meaningfully differs from the legal position ultimately taken in OA's [Office of Administration's] Motion for Judgment on the Pleadings, which Ms. Medaglia describes as reflective of the Executive Branch's final position on whether OA is an agency subject to FOIA.").

Here, an in camera inspection of the Goldsmith and Elwood Memoranda for the purposes of determining whether President Obama or his administration expressly adopted the reasoning therein would not be necessary because, as discussed infra, Sections IV.C.1.d-e, there is not sufficient evidence to show that the Administration referenced either memorandum enough to confirm adoption of their reasoning.

### d.  The Obama Administration did not adopt the reasoning of the Seitz Memorandum through subsequent references to it

Samahon further argues that both the Administration's repeated referrals to the Seitz Memorandum after it was released to the public and the Solicitor General's citation to the Seitz Memorandum in its briefs in NLRB v. Noel Canning constitute adoption of its reasoning.  In support of his arguments, Samahon highlights the following instances in which he claims adoption occurred.

First, Samahon argues that Press Secretary Jay Carney's statement proves that the President adopted the Seitz Memorandum as policy.  (Doc. No. 24 at 8.)  As mentioned previously, Carney fielded questions from reporters regarding President Obama's recess appointments.  When asked if the President made the appointments without the approval of the OLC, Carney explained that the OLC rendered its opinion verbally to the President prior to the date the Seitz Memorandum was published.  When it was published, it apparently covered in part the verbal advice given to the President.  Then, when asked whether the Administration was prepared for "litigation fights," Carney responded, "[w]ell, I would just refer you to the OLC [Seitz] Memo." (Doc. No. 24 at 8.)

The U.S. District Court for the Southern District of New York addressed this exact argument in New York Times Co. v. U.S. Department of Justice, the only other case that involves requested disclosure of the Goldsmith and Elwood Memoranda.  The District Court noted:

> The statements made by Carney do not on their face show adoption and incorporation of the Seitz Memorandum's reasoning as relevant to the President's decisionmaking process . . . .  When the reporter noted that the Seitz Memorandum was written after the President made his decision . . . [Carney] noted that the Seitz Memorandum was "lengthy" and that it is "standard . . . for [OLC written opinions] to be developed over a period of time . . . .  This suggests that the verbal opinion given to the President may not have reflected everything contained in the Seitz Memorandum, and makes it next to impossible for the

> Court to conclude that the President expressly adopted the reasoning of an as-yet
> written memorandum that may or may not have been fully communicated to him.
> Moreover, even assuming arguendo that the Seitz Memorandum was provided to
> the President in full, the press conference does not show express adoption of the
> reasoning of the Elwood or Goldsmith Memoranda.

N.Y. Times, No. 12-3215, 2013 WL 174222, at *8 (S.D.N.Y. Jan. 7, 2013).  This logic makes

sense: it is simply impossible to discern whether the Seitz Memorandum encompassed the

totality of the verbal advice given to President Obama, and it is equally impossible to conclude

that the President made his decision based on the verbal advice.  Thus, the connection between

the verbal advice, the Seitz Memorandum, and Carney's comments is too tenuous and

speculative to find express adoption of the reasoning in the Seitz Memorandum by President

Obama.

As to Carney's comments "referring" the reporter to the Seitz Memorandum, Samahon

claims that because Carney made this reference, he adopted the reasoning in the Seitz

memorandum, and by extension, the Goldsmith and Elwood Memoranda, as his "explanation of

Administration policy."  Carney's reference to the Seitz Memorandum was in response to a

reporter's question as to whether the Administration was prepared for litigation.  It was not a

comment on the quality of the advice contained therein.  Moreover, Carney's bald reference to

the Seitz Memorandum provides no evidence of the Administration's express adoption of the

reasoning of the Goldsmith and Elwood Memoranda, which the Seitz Memorandum references.

See also N.Y. Times, 2013 WL 174222, at *8 ("Even assuming Carney's statements might be

sufficient to show adoption of the publicly disclosed Seitz Memorandum," they are not specific

enough to show adoption of the reasoning of the predecisional Goldsmith and Elwood

Memoranda . . . ." ).

In light of the relevant case law, Carney's deferral to the Seitz Memorandum in response to the reporter's question is an insufficient basis on which to find that the Memorandum's reasoning was adopted on behalf of the President as a decisionmaker, and by extension, the reasoning in the Goldsmith and Elwood Memoranda.  In contrast to Carney's fleeting referrals, the Second Circuit in La Raza upheld waiver of the deliberative process privilege of an OLC memorandum because the Attorney General and other high ranking advisors used repeated disclosure "to assure third parties as to the legality of the actions third parties were being urged to take."  411 F.3d at 357.  The Court found that "[t]he references to the OLC Memorandum demonstrate that the Department regarded the Memorandum as the exclusive statement of, and justification for, its new policy . . . ."  Id.  The circumstances in this case are in stark contrast to the repeated disclosures in La Raza.  While the Seitz Memorandum was released as part of the government's response to questions surrounding the legality of the recess appointments, no evidence presented by Samahon supports the claim that the Seitz Memorandum was its exclusive justification for the appointments.

In addition to Carney's statements, Samahon relies on other actions of the government which he argues constitute express adoption of the Seitz Memorandum's reasoning.  Samahon contends that when the Solicitor General referenced the Seitz Memorandum in a U.S. Supreme Court certiorari petition and in a brief on the merits in the case of NLRB v. Noel Canning, the Obama Administration thereby "invoked the analysis and the conclusion of the Seitz Memorandum."  (Doc. No. 24 at 17.)

By way of background, the Solicitor General referenced the Seitz Memorandum once in the certiorari petition in the Noel Canning case to support the following assertion:

> By virtue of the Senate's unanimous-consent order, the second session of the
> 112th Congress began with a period of nearly three weeks, from January 3 to

> January 23, in which the Senate had provided that "no business [was to be] conducted," and during which no Senators were required to be in attendance other than the lone Senator who gaveled each pro forma session in and out.  See Lawfulness of Recess Appointments During a Recess of the Senate Notwithstanding Periodic Pro Forma Sessions [Seitz Memo.], 36 Op. Off. Legal Counsel [1]), at 2, 13 (Jan. 6, 2013), www.justice.gov/olc/2012/pro-forma-sessions-opinion.pdf

Petition for Writ of Certiorari, NLRB v. Noel Canning, 134 S. Ct. 2250 (2014) (No. 12-1281) (2013 WL 1771081, at *5).  This reference does not incorporate or adopt the legal reasoning of the Seitz Memorandum.  It is mentioned only in regard to the factual backdrop and timeframe of the pro forma sessions, and not to support any specific legal opinion taken in the certiorari petition.

Moving to the Solicitor General's merits brief, the Solicitor General cites the Seitz Memorandum (cited as "OLC Pro Forma Op.") five times.  The first instance is identical to the single reference quoted above from the certiorari petition.  The next three instances reference the Seitz Memorandum for factual support and not legal analysis:

> [N]early all of President Truman's successors have made, collectively, hundreds of additional intra-session recess appointments. App., infra, 27a-64a. The only apparent exceptions are President Kennedy, whose term included no intra-session recesses (Congressional Directory 529), and Presidents Johnson and Ford. Throughout that period, opinions of the Attorney General, the Office of Legal Counsel, and the en banc Eleventh Circuit reaffirmed the validity of intra-session appointments.  See Evans, 387 F.3d at 1224-1226; OLC Pro Forma Op. [Seitz Memo.] 5 (citing 1960 Attorney General opinion and OLC opinions from 2004, 1992, 1989, and 1979); 20 Op. O.L.C. 124, 161 (1996); 6 Op. O.L.C. 585, 585 (1982).[20]
>
> ***
>
> Daugherty's [Attorney General in 1921] analysis has continued to govern the Executive's approach, providing the basis for appointments by multiple

---

[20] Samahon points out that this citation to the Seitz Memorandum contains a string citation that includes the Goldsmith Memorandum, which is noted in this paragraph as the OLC opinion from 2004.  For reasons discussed infra in this Section, this one citation to the Goldsmith Memorandum is included merely as evidence of a consistent Executive Branch position.  It is not cited for the reasoning contained therein.  Thus, this citation to the Goldsmith Memorandum is insufficient to constitute a waiver.

Presidents during intra-session recesses as short as ten days.  See OLC Pro Forma Op. [Seitz Memo.] 5-9; id. at 7 (noting that the last five Presidents have all made appointments during intra-session recesses of 14 or fewer days).

***

In respondent's view, the "explicit purpose" of the pro-forma sessions in December 2011 and January 2012 was not an internal legislative one, but a desire to deny the President the authority to make recess appointments.  Resp. C.A. Br. 59; id. at 8-9 (citing letter from 20 Senators asking the Speaker of the House to prevent the Senate from adjourning for more than three days, and letter from 78 Representatives urging prevention of recess appointments); cf. OLC Pro Forma Op. [Seitz Memo.] 2 (citing statements from Senator Reid attributing that purpose to pro-forma sessions in 2007 and 2008).

Brief for Petitioner, NLRB v. Noel Canning, 134 S. Ct. 2550 (2014) (No. 12-1281) (2013 WL 5172004, at *3, 27, 46, 56).

The three references to the Seitz Memorandum provide no evidence that the Obama Administration, through the Solicitor General, expressly adopted the reasoning of the Memorandum.   In order of citation, the references address (1) how presidents historically have made recess appointments; (2) the practice of the past five presidents making appointments during intra-session recesses lasting fourteen or fewer days; and (3) the political purpose behind pro forma sessions.   The Seitz Memorandum is cited for this information because it contains historical facts and political background information.  These excerpts from the merits brief do not contain any legal analysis or reasoning even capable of adopting.

The final reference to the Seitz Memorandum in the merits brief is as follows:

Since then, the Office of Legal Counsel conducted a thorough examination of the implications of the Senate's efforts to convene pro-forma sessions at which no business is to be conducted, and it concluded that such sessions do not interrupt a Senate recess for purposes of the President's recess-appointment power.  OLC Pro Forma Op. [Seitz Memo.] 9-23.  The Board's position here is consistent with that analysis.

Id. at *59.

This citation refers to the conclusion made by the OLC on recess appointments.  It also references that the Board, which is the NLRB as petitioner in the U.S. Supreme Court case, agrees with the conclusion and the examination of the matter by the OLC.  Although the Solicitor General is the chief courtroom lawyer for the executive branch,[21] and aided the NLRB in the litigation process, the NLRB as the petitioner is the agency that made the adoption consistent with the analysis or examination made by OLC.  Because the NLRB was not the "decisionmaker" behind the recess appointments, which was the President, its adoption of the analysis is not binding on President Obama and is not relevant to whether the Obama Administration made an adoption of the reasoning of the Seitz Memorandum.

These six references, which provide conclusions rather than reasoning, fall short of the level of adoption necessary to effectuate waiver in light of relevant case law.  In La Raza, the Attorney General explicitly cited an unpublished Memorandum three times as a justification for a reversal of course on immigration policy.  411 F.3d 350, 353-55 (2d Cir. 2005).  Additionally, the memorandum in question was cited two times by acting Assistant Attorneys General in letters to Congress, and once more by counsel to the Attorney General as justifications and statements of agency policy.  Id. at 353-54.  The Second Circuit found waiver in this instance because high-ranking officials repeatedly cited the memorandum, thus "demonstrat[ing] that the Department regarded the Memorandum as the exclusive statement of, and justification for, its new policy . . . ." Id. at 357.  In contrast here, the sole reference to the conclusion of the Seitz Memorandum, coupled with a statement that the Board's (NLRB's) position is consistent with

---

[21]  The Solicitor General is "the second-highest ranking legal officer in a government (after the attorney general); esp., the chief courtroom lawyer for the executive branch."  Black's Law Dictionary 1608 (10th ed. 2014).

that analysis, is too vague a reference on which to find explicit adoption of the reasoning by President Obama.

> ### e. The references to the Goldsmith and Elwood Memoranda in the Seitz Memorandum do not support express adoption of those documents by the President

Because the Court holds in this case that the Obama Administration did not expressly adopt the reasoning of the Seitz Memorandum, it would be illogical to find that by association, the Administration expressly adopted the reasoning of the Goldsmith and Elwood Memoranda cited therein.  Even assuming arguendo that the Administration adopted the Seitz Memorandum, it does not necessarily follow that by referring to the Goldsmith and Elwood Memoranda in the Seitz Memorandum, the Administration expressly adopted the reasoning of these two memoranda as a matter of course.

Nevertheless, Samahon advances this layered argument, citing Niemeier v. Watergate Special Prosecution Force for the proposition that "adoption of an agency position on an issue not only subjects the instant record or document to disclosure, but also to any document relied upon in the development of that position."  Doc. No. 24 at 15, citing 565 F.2d 967, 973 (7th Cir. 1977) ("In a case such as this where an underlying memorandum is expressly relied on in a final agency dispositional document, even though only part of it is expressly reproduced, we hold that a presumption in favor of disclosability of the memorandum as a whole is created.").  Using Neimeier, Samahon contends that because Seitz Memorandum "relied" on the Goldsmith and Elwood Memoranda through its references, the Goldsmith and Elwood Memoranda should be disclosed in their entirety.

In contrast to "reliance" on underlying memoranda as discussed in Niemeier, the D.C. Circuit held in Common Cause v. IRS, that "casual allusion in a post-decisional document to subject matter discussed in some pre-decisional, intra-agency memoranda is not the express

adoption or incorporation by reference which . . . would remove the protection of Exemption 5."

646 F.2d 656, 660 (D.C. Cir. 1981); see also In re Sealed Case, 121 F.3d 729, 741 (D.C. Cir.

1997) (holding that the release of a final White House report does not waive privileges attached

to the "documents generated in the course of producing the report," and that "release of a

document only waives [] privileges for the document or information specifically released, and

not for related materials." (emphasis added)).

The Seitz Memorandum's references to the Goldsmith and Elwood Memoranda are

casual allusions similar to the references in Common Cause v. IRS.  Here, the Seitz

Memorandum is twenty-three single-spaced pages.  It references the Goldsmith Memorandum

six times and the Elwood Memorandum once.  Furthermore, all but one reference utilize the

memoranda for purely factual and historical background, or refer to the advisory opinion given

about recess appointments.

Specifically, the Seitz Memorandum directly quoted the Goldsmith Memorandum in the

following instances:

> This Office has consistently advised that "a recess during a session of the Senate,
> at least if it is sufficient length, can be a 'Recess' within the meaning of the
> Recess Appointments Clause" during which the President may exercise his
> power to fill vacant offices."  Memorandum for Alberto R. Gonzales, Counsel to
> the President, from Jack L. Goldsmith III, Assistant Attorney General, Office of
> Legal Counsel, Re: Recess Appointments in the Current Recess of the Senate at 1
> (Feb. 20, 2004) ("Goldsmith Memorandum").
>
> ***
>
> "The number of days in a recess period is ordinarily calculated by counting the
> calendar days running from the day after the recess begins including the day the
> recess ends.  Goldsmith Memorandum at 1."
>
> ***
>
> And both this Office and the Department of Justice in litigation have recognized
> the argument that 'the three days set by the Constitution as the time during which
> one House may adjourn without the consent of the other, U.S. Const. art. I, § 5,

cl. 4, is also the length of time amounting to a 'Recess' under the Recess Appointments Clause." Goldsmith Memorandum at 3.

(Seitz Memo. at 1, 1 n.1, 9 n.13.)

Here, the three quotations from the Goldsmith Memorandum do not discuss or adopt the reasoning in the Memorandum. They merely supply factual support for the consistent historical practice regarding recess appointments, explain how a recess period is normally calculated, or state the advisory opinion being rendered.

In the remaining three instances, the Seitz Memorandum merely referenced the Goldsmith Memorandum without quoting from it:

> The Department of Justice "has long interpreted the term 'recess' to include intrasession recesses if they are of substantial length." . . . see also Goldsmith Memorandum at 1-2.
>
> ***
>
> Attorneys General and this Office have repeatedly affirmed the President's authority to make recess appointments during intrasession recesses of similar or shorter length. See, e.g., Goldsmith Memorandum at 2-3 (recognizing President's authority to make a recess appointment during an intrasession recess of eleven days).
>
> ***
>
> In fact, the Senate had adjourned pursuant to such a resolution before the intrasession recess during which Judge Pryor was appointed to the Eleventh Circuit. That recess appointment was approved by this Office, see Goldsmith Memorandum, and upheld by the court of appeals en banc, see Evans v. Stephens, 387 F.3d 1220.

(Seitz Memo. at 5-6, 21.)

These references are to facts and to the advisory opinion. They use the Goldsmith Memorandum as evidence of DOJ conclusions about the sufficient length of intrasession recesses, the history of Attorneys General affirming intrasession recesses, and that the OLC approved an intrasession appointment, an OLC conclusion. The Seitz Memorandum's citations to the factual material and conclusions in the Goldsmith Memorandum are made without expressly adopting its reasoning. Thus, the protection under the deliberative process privilege

afforded to the Goldsmith Memorandum remains intact.  See <u>Access Reports v. U.S. Dep't of Justice</u>, 926 F.2d 1192, 1197 (D.C. Cir. 1991) ("The Court has refused to equate reference to a report's conclusions with adoption of its reasoning, and it is the latter that destroys privilege.")

Turning to the Elwood Memorandum, the Seitz Memorandum referenced it only once as follows:

> The question [about recess appointments despite pro forma sessions] is a novel one, and the substantial arguments on each side create some litigation risk for such appointments. We draw on the analysis developed by this Office when it first considered the issue. <u>See</u> Memorandum to File, from John P. Elwood, Deputy Assistant Attorney General, Office of Legal Counsel, <u>Re: Lawfulness of Making Recess Appointment During Adjournment of the Senate Notwithstanding Periodic "Pro Forma Sessions</u>" (Jan. 9, 2009).

(Seitz Memo. at 4.)

Samahon argues that because the Seitz Memorandum "drew on its analysis," it expressly adopted the Elwood Memorandum.  (Doc. No. 24 at 19.)  However, this single sentence falls short of adoption of the Elwood Memorandum's ultimate reasoning and analysis.  The reference says nothing about what conclusion was reached in the file memorandum, let alone the reasoning it employed to reach it.  As the Colborn Declaration explains, the legal analysis set forth in the file memorandum was never finalized, but was preserved simply "as a record of OLC's work on the issue."  (Colborn Decl. ¶ 19.)  Furthermore, this isolated reference is similar to the reference described in <u>Brennan Center for Justice v. U.S. Dep't of Justice</u>, where the Second Circuit held that an agency's bald statement that its action was "consistent with guidance from the U.S. Department of Justice" was insufficient to constitute waiver through adoption or incorporation.  697 F.3d at 205.

Thus, the Seitz Memorandum's references to the two memoranda are akin to the "casual allusions" and "minor references" which were found not to constitute waiver in <u>Common Cause</u>

43

v. IRS, 646 F.2d 656, 660 (D.C. Cir. 1981) and Tigue v. U.S. Department of Justice, 312 F.3d 70

(2d Cir. 2002).  In Common Cause, plaintiff sought twenty-two internal IRS memoranda which

discussed the reasons for a proposed, but later rejected, IRS policy about a process of public

disclosure of the names of federal officials who inquired about tax matters of third parties.  646

F.2d at 657-58.  Plaintiff claimed that the IRS waived privilege under Exemption 5 because a

subsequent IRS memorandum that was disclosed referred to policy reasons discussed in the

twenty-two internal memoranda.  Id. at 660.  Despite disclosure of these reasons, the Court of

Appeals held that this disclosure was too offhand to waive privilege, holding that "casual

allusion in a post-decisional document to subject matter discussed in some pre-decisional, intra-

agency memoranda is not the express adoption or incorporation by reference which . . . would

remove the protection of Exemption 5."  Id. at 656, 660.  Moreover, in Tigue, plaintiffs sought

disclosure of an unpublished deliberative memorandum, an excerpt of which, containing a

general policy opinion, was quoted in a public report.  The Second Circuit held that this "minor

reference cannot be said to be an express adoption or incorporation."  312 F.3d at 81.

Here, the citations to and quotes from the Goldsmith and Elwood Memoranda do not

contain policy reasons and are minor factual references given the length and overall content of

the Seitz Memorandum.  Thus, they were not expressly adopted or incorporated by their citation

in the latter Memorandum.

### 2. The "working law" exception does not apply

The privileges covered by Exemption 5 may also be waived for any document that has

the "force and effect of law."  NLRB v. Sears, Roebuck & Co., 421 U.S. 132, 153 (1975).  If a

document has the "force and effect of law," it falls under what is known as the "working law"

waiver to Exemption 5.  This kind of document must be disclosed because of "strong

congressional aversion to secret agency law."[22]  Id.  (quoting H.R. Rep. No. 89-1497, reprinted at 1966 U.S.C.C.A.N. 2418, 2424).

The types of information that constitute "working law" as discussed in Sears, Roebuck & Co. are "those policies or rules, and the interpretations thereof, that either create or determine the extent of the substantive rights and liabilities of a person . . . ."  Afshar v. Dep't of State, 702 F.2d 1125, 1141 (D.C. Cir. 1983).  In other words, the working law exception "calls for disclosure of all opinions and interpretations which embody the agency's effective law and policy, and the withholding of all papers which reflect the agency's group thinking in process of working out its policy and determining what its law shall be."  Sears, Roebuck & Co., 421 U.S. at 153; see also Elec. Frontier Found. v. U.S. Dep't of Justice, 739 F.3d 1, 8 (D.C. Cir. 2014) (quoting Schlefer v. United States, 702 F.2d 233, 244 (D.C. Cir. 1983)) ("[A]n agency must disclose 'binding agency opinions and interpretations' that the agency 'actually applies in cases before it.'").

The Goldsmith and Elwood Memoranda, as OLC memoranda, do not constitute "working law."  They are not an expression of final agency policy because they are advisory and cannot bind the President in his decisionmaking.  Moreover, the OLC is an agency that does not make final decisions or create "agency law."  Rather than creating law, the OLC provides

---

[22]  The Supreme Court in Sears, Roebuck & Co. explained the policy reason for disclosing such "working law";

> The public is only marginally concerned with reasons supporting a policy which an agency has rejected, or with reasons which might have supplied, but did not supply, the basis for a policy which was actually adopted on a different ground. In contrast, the public is vitally concerned with the reasons which did supply the basis for an agency policy actually adopted.  These reasons, if expressed within the agency, constitute the 'working law' of the agency and have been held by the lower courts to be outside the protection of Exemption 5.

421 U.S. at 152-53.

nonbinding legal opinions to decisionmakers in the executive branch that have no operative

effect within the OLC or on substantive rights or liabilities of the public in general.  See Sears,

Roebuck & Co., 421 U.S. at 153; see also Brennan Ctr. for Justice, 697 F.3d at 203 (holding that

because two OLC memoranda were merely advisory, they did not constitute working law or

OLC's effective law and policy).  Here, only the President, not the OLC, has the power to make

recess appointments, rendering any OLC advisory memorandum legally inoperative.  On this

point, the Court agrees with the conclusion of the Court in New York Times:

> [T]he Constitution grants the power to make recess appointments to the
> President, not the OLC.  U.S. Const. art. II, § 2.  Neither the Seitz Memorandum
> nor the Goldsmith and Elwood Memoranda that it cites are the working law of
> the OLC, nor are they "effectively binding" on the President.  Brennan Ctr., 673
> F.3d at 203; accord Brinton v. Dep't of State, 636 F.2d 600, 605 (D.C. Cir. 1980)
> (legal memoranda from State Department's Office of Legal Adviser to Secretary
> of State not working law as Office of Legal Adviser "has no authority to make
> final decisions" concerning U.S. Policy) . . . . Thus, the working law exception is
> inapplicable.

2013 WL 174222, at *5.

This conclusion parallels the D.C. Circuit's reasoning in Electronic Frontier Foundation

v. United States Department of Justice, 739 F.3d 1 (D.C. Cir. 2014).  In Electronic Frontier

Foundation, plaintiff requested under FOIA an OLC memorandum to the FBI which provided

the FBI with guidance on proposed investigatory techniques.  The D.C. Circuit held that the

OLC memorandum could not be considered "working law" of the FBI because it did not have

the authority to establish "working law" on the FBI's behalf and because the FBI was free to

disregard the advice.  The Court noted that:

> Because OLC cannot speak authoritatively on the FBI's policy, the OLC Opinion
> differs from memoranda we have found to constitute the 'working law' of an
> agency  . . . .  Even if the OLC Opinion describes the legal parameters of what
> the FBI is permitted to do, it does not state or determine the FBI's policy.  The
> FBI was free to decline to adopt the investigative tactics deemed legally
> permissible in the OLC Opinion . . . .  The OLC Opinion does not provide an

authoritative statement of the FBI's policy.  It merely examines policy options available to the FBI.  Therefore, the OLC Opinion is not the 'working law' of the FBI . . . .

Id. at 10 (emphasis in original).

There is no difference between the OLC memorandum to the FBI in Electronic Frontier Foundation and the OLC memoranda at issue in this case.  The OLC cannot speak authoritatively on the President's policy, and even though the memoranda here advised the President that he was permitted to make the recess appointments, the President was free to decline the advice.  Therefore, based on the foregoing, the Seitz, Goldsmith, and Elwood Memoranda are not documents that constitute "working law."  For this reason, the "working law" waiver does not apply here.

> **D.    The Court Will Require an In Camera Inspection of the Elwood Memorandum In Order to Decide Whether There Are Any Reasonably Segregable Facts**

Finally, Samahon argues in the alternative that even if the Goldsmith and Elwood Memoranda were properly withheld under Exemption 5, the DOJ nevertheless had a duty to disclose reasonably segregable factual material contained in both memoranda.  For reasons that follow, the Court will order that the DOJ provide the Court only with the Elwood Memorandum for in camera inspection.  The Court will first address the reasons for requiring an in camera disclosure of the Elwood Memorandum.

> **1.   Elwood Memorandum**

Here, two privileges apply to the Elwood Memorandum: the deliberative process privilege, and the attorney-client privilege.  A court must examine whether the privileges protect all facts in the Elwood Memorandum from disclosure, or only those facts related to the privileges.

47

Pursuant to FOIA, the agency has the burden of proving that the withheld portions were not reasonably segregable from the privileged material.  5 U.S.C. § 552(a)(4)(B); Abdelfattah, 488 F.3d at 186.  Generally, an agency is "entitled to a presumption that [it] complied with the obligation to disclose reasonably segregable material." Venkataram v. Office of Info. Policy, No. 09-6530, 2013 WL 3871730, at *6 (D.N.J. July 25, 2013) aff'd, 590 F. App'x 138 (3d Cir. 2014) (quoting Sussman v. U.S. Marshals Serv., 494 F.3d 1106, 1117 (D.C. Cir. 2007)).

Starting the analysis with the deliberative process privilege, factual material contained in a document protected by the deliberative process privilege is not exempt from disclosure.  See Cozen O'Connor v. U.S. Dep't of Treasury, 570 F. Supp. 2d 749, 780 (E.D. Pa. 2008) ("The deliberative process privilege goes to conceptualizing and not to the gathering of facts. Documents that contain only factual material, even though used in the deliberative process, must be disclosed.").

However, despite an agency's duty to sift and separate factual material, "when factual material exposes the deliberative process, it can be withheld unless the agency can redact the exempt material without revealing the thought process." Cozen O'Connor, 570 F. Supp. 2d at 780; see also Elec. Frontier Found., 739 F.3d 1, 13 (D.C. Cir. 2014); Quarles v. Dep't of Navy, 893 F.2d 390, 392 (D.C. Cir. 1990) (holding that facts can be withheld if disclosure "would expose an agency's decisionmaking process in such a way as to discourage candid discussion within the agency and thereby undermine the agency's ability to perform its functions").

A court may examine affidavits provided by the agency in determining whether the agency has provided enough descriptive information to determine whether segregable facts exist.  In its disclosures, an agency must make more than a conclusory statement that it made efforts to separate the facts from the exempt material.  See Davin v. U.S. Dep't of Justice, 60

F.3d 1043, 1052 (3d Cir. 1995).  Instead, the agency's declaration must "describe the process by which he determined that all reasonably segregable material of each of the withheld documents had been released" and "a factual recitation of *why* certain materials were not reasonably segregable."  Id. (emphasis added).  Additionally, the agency should indicate "what proportion of the information in a document is non-exempt and how that material is dispersed throughout the document."  Abdelfattah, 488 F.3d at 187 (quoting Mead Data Cent., Inc. v. U.S. Dep't of Air Force, 566 F.2d 242, 261 (D.C. Cir. 1977)) (internal quotation marks omitted).

In this case, Colborn's affidavit falls short of this standard: it provides no description of the process of separating facts from privileged material and it provides no factual recitation of why certain materials were not reasonably segregable.  It merely sets forth the following conclusory statement regarding the Elwood Memorandum: "The limited factual material contained in the Elwood File Memorandum is closely intertwined with the draft legal analysis that the Memorandum contains."  (Colborn Decl. ¶ 27.)  Thus, this description does not permit the Court to determine whether there are segregable facts not covered by the deliberative process privilege that must be disclosed.

Turning to the attorney-client privilege, the DOJ claims that the factual material in the Elwood Memorandum also is exempt from disclosure because it is protected by attorney-client privilege.  However, the DOJ cites no relevant case law that permits factual material that would not reveal confidential communications between attorney and client to be withheld under the attorney-client privilege pursuant to Exemption 5.[23]  In fact, the District Court for the District of

---

[23]   As noted previously, the attorney-client privilege is distinct from the attorney work product privilege.  Factual material or attorney advice can also be withheld if it is attorney work product.  In order for facts or advice to be considered work product, it must be created in anticipation of litigation.  Here, the DOJ makes no claim and provides no evidence that the Elwood or Goldsmith Memoranda were created in anticipation of litigation.  Accordingly,

Columbia has held in two cases that such non-privileged factual material, even if the entire communication may be subject to the attorney-client privilege, must still be disclosed in FOIA cases.  See Nat'l Whistleblower Ctr. v. Dep't of Health and Human Servs., 903 F. Supp. 2d 59, 69-70 (D.D.C. 2012) ("[A]s to the documents withheld pursuant to either the deliberative-process or attorney-client privilege (or both), an agency must disclose all reasonably segregable, nonexempt portions of the requested record(s)." (internal quotation marks omitted)); Judicial Watch, Inc. v. U.S. Dep't of Treasury, 802 F. Supp. 2d 185 (D.D.C. 2011) (holding that the Department of Treasury was required to disclose reasonably segregable factual material despite the fact that the document was protected under attorney-client privilege).

Thus, absent adequate agency guidance, a court can order an in camera inspection of the documents in question to make a segregability determination.  5 U.S.C. § 552(a)(4)(B).  "In both the ordinary and the exceptional case, in camera affidavits and submissions are authorized and the district court may resort to them in arriving at its ultimate determination."  Lame v. U.S. Dep't of Justice, 654 F.2d 917, 922 (3d Cir. 1981); see also Samahon v. FBI, No. 12-4839, 2014 WL 4179933, at *5 (E.D. Pa. Aug. 25, 2014).  As to the Elwood Memorandum, because the Department of Justice has not supplied the Court with the adequate information regarding segregability in the Colborn Declaration, the Court will order that the Department of Justice turn over the Elwood Memorandum under seal for an in camera inspection.  After review of the document, the Court will notify the parties if any segregable factual information exists which must be disclosed.

---

the work product privilege does not apply.  See Manna v. U.S. Dep't of Justice, 815 F. Supp. 798 (D.N.J. 1993) ("The work product doctrine is designed to protect materials prepared by an attorney acting for his client in anticipation of litigation . . . .  Under FOIA's Exemption 5, the work product privilege simply does not distinguish between factual and deliberative material.  Therefore, factual work-product materials are immune from disclosure." (citations and internal quotation marks omitted)), aff'd, 51 F.3d 1158 (3d Cir. 1995).

### 2.  Goldsmith Memorandum

Because the Goldsmith Memorandum is protected by an additional privilege, the

presidential communications privilege, an <u>in camera</u> inspection of the Memorandum for any

reasonably segregable factual material is not required.[24]  The presidential communications

privilege encompasses more of the communication than the deliberative process and attorney-

client privileges, and extends to specific facts in the communication, segregable and non-

segregable alike.  <u>In re Sealed Case</u>, 721 F.3d at 750.  As the court noted in <u>In re Sealed Case</u>:

> The protection offered by the more general deliberative process privilege will
> often be inadequate to ensure that presidential advisers provide knowledgeable
> and candid advice, primarily because the deliberative process privilege does not
> extend to purely factual material.  As we remarked in <u>AAPS</u>, preservation of the
> President's confidentiality requires that a "[g]roup directly reporting and
> advising the President must have confidentiality at each stage in the formulation
> of advice to him."  997 F.2d at 910.  In many instances, potential exposure of the
> information in the possession of an adviser can be as inhibiting as exposure of
> the actual advice she gave to the President.  Without protection for her sources of
> information, an adviser may be tempted to forego obtaining comprehensive
> briefings or initiating deep and intense probing for fear of losing deniability.
> Exposure of the factual portions of presidential advisers' communications also
> represents a substantial threat to the confidentiality of the President's own
> deliberations.  Knowledge of factual information gathered by presidential
> advisers can quickly reveal the nature and substance of the issues before the
> President, since "[i]f you know what information people seek, you can usually
> determine why they seek it." <u>Id.</u>

<u>Id.</u> at 750-51 (quoting <u>Ass'n of Am. Physicians and Surgeons, Inc. v. Clinton</u>, 997 F.2d 898

(D.C. Cir. 1993)).  Accordingly, because the Goldsmith Memorandum is protected by the

presidential communications privilege, the facts therein are not subject to disclosure and an <u>in</u>

<u>camera</u> inspection is not necessary.

## V.    CONCLUSION

Based upon the foregoing, Defendant's Motion for Summary Judgment (Doc. No. 22)

will be granted on Counts One, Two, and Three of the Amended Complaint.  Accordingly,

---

[24]  As noted, the Goldsmith Memorandum was actually given to Counsel to President Bush.

Plaintiff's Motion for Summary Judgment (Doc. No. 24) will be denied on Counts One, Two, and Three.  The Court will reserve judgment on Defendant's Motion for Summary Judgment as to Count Four, pending an <u>in camera</u> review of the Elwood Memorandum.  An appropriate Order follows.